STATE OF NORTH CAROLINA v. JAMES BARTLETT UPCHURCH, III

No. 89A90

(Filed 1 October 1992)

**1. Jury § 6.4 (NCI3d) — murder — jury selection — prosecutor's comment — potential sentencing hearing — curative instructions — no prejudice**

There was no prejudice during jury selection for a first degree murder prosecution where the prosecutor said to potential jurors concerning the death penalty that "there is a very good possibility that you may have to answer that question." The prosecutor was explaining the distinction between the two phases of a capital trial and did not inform the jury that a sentencing phase was certain in defendant's trial, and the trial court gave a curative instruction. The statements and questions by the State were not of such a highly incriminating nature as to make the court's curative instruction insufficient to avert any prejudice.

Am Jur 2d, Jury §§ 195 et seq.

**2. Jury § 6.3 (NCI3d) — murder — jury selection — improper comment by prosecutor — proper instruction by court**

There was no prejudice during jury selection in a first degree murder prosecution from the prosecutor's comment that a juror would have to "look the monster in the eye" where the court sustained defendant's objection, granted the motion to strike, and instructed that juror and other members of the panel to disregard the statement.

Am Jur 2d, Jury §§ 195 et seq.

**3. Jury § 6.3 (NCI3d) — murder — jury selection — comment by prosecutor — comparison to codefendants — no prejudice**

There was no prejudice during jury selection for a murder prosecution where the court allowed the prosecutor to ask potential jurors whether they could weigh the testimony of two potential witnesses as they would other witnesses even though the two witnesses had entered a plea arrangement. The facts behind the plea bargains were fully aired during the trial and defendant failed to show any prejudice.

Am Jur 2d, Jury §§ 195 et seq.

STATE v. UPCHURCH

[332 N.C. 439 (1992)]

4. **Criminal Law § 395 (NCI4th)— murder—jury selection— comment by judge on trial—comparison to football game**

The trial court did not express an opinion during jury selection for a murder prosecution when it described the proceeding to potential jurors as being like the two halves of a football game. Although defendant contended that the trial court unwittingly communicated an opinion that the case would have a penalty phase, the court used the term "may" and did not express an opinion.

**Am Jur 2d, Trial § 277.**

5. **Criminal Law § 528 (NCI4th)— murder—bench conference concerning next witness—"probation officer" spoken loudly— mistrial denied**

There was no abuse of discretion in the denial of a mistrial in a murder prosecution where the prosecutor spoke the words "probation officer" loudly during a bench conference concerning the next witness and evidence of defendant's prior convictions had not yet been admitted. Testimony during voir dire did not indicate that any of the witnesses heard the probation officer referred to by name, neither witness questioned knew whether the probation officer was defendant's or one of the codefendants', the trial court told the jurors to disregard anything they had heard and asked if they would be able to do that, none of the jurors said that they would be unable to do so, the trial court subsequently asked whether the jurors had heard anything at the conference, and no juror said that he had.

**Am Jur 2d, Trial § 499.**

6. **Constitutional Law § 342 (NCI4th)— murder—unrecorded bench and chambers conferences—no error**

The trial court did not err in a murder prosecution by conducting 78 unrecorded bench conferences and 2 unrecorded chambers conferences with counsel where defendant did not show or contend that he was absent from the courtroom during these proceedings and defendant acknowledges that his counsel was present at all of the bench and chambers conferences; defendant failed to show that his actual presence would have added to his defense; and defendant failed to show that the conferences implicated his confrontation rights or that his

presence would have had a reasonably substantial relationship to his opportunity to defend.

**Am Jur 2d, Trial §§ 226, 227.**

7. **Constitutional Law § 342 (NCI4th)— murder—judge's contact with juror—letter for employer—no constitutional error**

There was no prejudicial constitutional error in a murder prosecution where the record was abundantly clear that the court's contact with a juror outside defendant's presence was about a letter signed for the juror for the benefit of the juror and her employer, consistent with the customary practice of our courts to ease employed jurors' stress during jury duty.

**Am Jur 2d, Trial §§ 272 et seq.**

**Postretirement out-of-court communications between jurors and trial judge as grounds for new trial or reversal in criminal case. 43 ALR4th 410.**

8. **Burglary and Unlawful Breakings § 72 (NCI4th)— burglary— family residence of coconspirator—permission to enter—no authority**

A defendant in a first-degree burglary prosecution was without consent to enter a house where defendant entered into a conspiracy with a fellow college student to kill the coconspirator's parents. As a child who had a room in his parents' home, the authority of the coconspirator (Pritchard) was not unlimited and it cannot be said that either Pritchard or defendant had any good faith, reasonable belief that Pritchard had authority to give defendant permission to enter his parents' home for purposes of their conspiracy in the middle of the night when Pritchard was not there.

**Am Jur 2d, Burglary § 13.**

**Maintainability of burglary charge, where entry into building is made with consent. 93 ALR2d 531.**

9. **Criminal Law § 1352 (NCI4th)— murder—sentencing—McKoy error**

There was *McKoy* error in a murder prosecution where the trial court instructed the jury to answer "no" to each mitigating circumstance that it failed to answer unanimously

and the State could not meet its burden of establishing that the error was harmless beyond a reasonable doubt.

**Am Jur 2d, Trial § 1121.**

10. **Constitutional Law § 207 (NCI4th) — separate convictions for burglary and murder — felony murder rejected — burglary as aggravating factor for murder**

The trial court did not violate defendant's right to be free from double jeopardy where defendant was convicted separately of burglary and first degree murder based on premeditation and deliberation, but not of felony murder, and the court submitted to the jury as an aggravating circumstance that the offense was committed while defendant was engaged in a burglary. N.C.G.S. § 15A-2000(e)(5).

**Am Jur 2d, Criminal Law §§ 277, 279.**

APPEAL as of right by defendant pursuant to N.C.G.S. § 7A-27(a) from a judgment imposing a sentence of death entered by *Watts, J.*, at the 2 January 1990 Special Criminal Session of Superior Court, PASQUOTANK County, upon a jury verdict finding defendant guilty of first-degree murder. Defendant's motion to bypass the Court of Appeals as to his convictions of felonious assault, first-degree burglary, felonious larceny and conspiracy was allowed by this Court on 23 September 1991. Heard in the Supreme Court on 9 March 1992.

*Lacy H. Thornburg, Attorney General, by Steven F. Bryant, Special Deputy Attorney General, for the State.*

*Malcolm Ray Hunter, Jr., Appellate Defender, by Staples Hughes, Assistant Appellate Defender, for the defendant-appellant.*

LAKE, Justice.

Defendant was indicted for the murder of Leith Peter Von Stein and was tried capitally at the 2 January 1990 Special Criminal Session of Superior Court, Pasquotank County. The jury found defendant guilty of first-degree murder on the theory of premeditation and deliberation. Following a sentencing proceeding, the jury recommended a sentence of death for the murder conviction, and on 30 January 1990, the trial court sentenced defendant to death in accordance with the jury's recommendation. Defendant also was

STATE v. UPCHURCH

[332 N.C. 439 (1992)]

sentenced to life imprisonment for first-degree burglary, twenty years for felonious assault with a deadly weapon with intent to kill inflicting serious injury, and six years for felonious larceny and conspiracy to commit murder, all to run consecutively. We find no prejudicial error in the guilt phase of defendant's trial, but conclude that defendant is entitled to a new sentencing hearing under *McKoy v. North Carolina*, 494 U.S. 433, 108 L. Ed. 2d 369, *on remand*, 327 N.C. 31, 394 S.E.2d 426 (1990).

The evidence presented by the State at trial tended to show that on 25 July 1988, Bonnie Bates Von Stein was residing in Washington, North Carolina, at 110 Lawson Road, with her husband, Leith Peter Von Stein, and her two children from a previous marriage, Chris and Angela Pritchard. Mr. and Mrs. Von Stein were married in 1979 when the children were preteens. According to Mrs. Von Stein, the children had a good relationship with her husband.

In 1987, Mr. Von Stein's parents, who operated a family dry cleaning business in Winston-Salem, died and left Von Stein approximately $1,000,000. Von Stein had a $700,000 life insurance policy on his own life, with his wife as beneficiary and her children as contingent beneficiaries. Upon Leith Von Stein's death, $600,000 of the million-dollar inheritance from his parents was to fund a trust for the benefit of the children. The balance was to fund a spousal trust for the benefit of Mrs. Von Stein. Upon her death, the spousal trust fund was to go to the children's trust fund. The corpus of the children's trust was to be distributed when Angela Pritchard turned thirty-five years old. The children were aware of the inheritance, but were unaware of the mechanics of the trust.

Chris Pritchard graduated from high school in June 1987 and enrolled at North Carolina State University in August for the fall semester. His first semester grades were fair and during the spring semester of 1988, his grades declined.

Between the spring semester and the first session of summer school, Chris Pritchard noticed a sign posted in his dorm with information about the game Dungeons and Dragons. The sign listed a room number for interested persons. Pritchard went to the room and met Neal Henderson and the defendant. The three decided to play the game on a regular basis. Pritchard first learned to play the game when he was twelve years old. Pritchard and the defendant would also drink beer and smoke marijuana together.

Dungeons and Dragons is a role-playing game in which people create their own world of characters. Pritchard, Henderson and the defendant played the game based on the sword and sorcery theme of medieval times. The general classes of characters included bards, magic users, thieves and fighters.

Early during the first session of summer school in 1988, Chris Pritchard returned home to Washington for a brief visit. Mr. Von Stein and Chris argued over Chris' academic performance, with the two almost engaging in a physical fight. During dinner, Von Stein again challenged Chris to a fight, but Chris refused. Following the confrontation, Mr. and Mrs. Von Stein agreed that she should be the one to discipline the children. For the remainder of the first summer session, Chris did not return home, and the Von Steins continued to pay for his education and to provide him with $50 a week in spending money. When Chris failed to welcome his sister when she drove to Raleigh for a prearranged visit on the July 4th weekend, and Bonnie Von Stein could not reach him by phone for two days, Mrs. Von Stein filed a missing person report. Later, when Chris did call, Mrs. Von Stein asked him to begin keeping an account of how he was spending his money. Chris also enrolled for the second session of summer school.

On Wednesday, 20 July 1988, while they were in summer school, Pritchard and defendant discussed the subject of what would happen if Pritchard's parents were dead. Pritchard told defendant that if anything happened to his parents, he would assist defendant in opening his own restaurant and they could live in a big house in North Raleigh and drive fine cars. At this time, Pritchard ostensibly was not serious about the proposals. The next day, Pritchard spoke seriously with defendant for the first time about killing his parents for their money. Pritchard was aware that his stepfather had inherited over a million dollars and told the defendant that his parents were millionaires.

Pritchard and the defendant decided to start a fuse-box fire at the Von Stein house that Saturday and to put crushed sleeping pills in the Von Steins' food so that they would sleep through the fire. They planned to crush a fuse and put it in the fuse box to make it look like an accident. When defendant asked about the possibility of Angela Pritchard being present in the house, Chris Pritchard said, "Well, if she is there, then I guess her, too; but if she is not, that's fine too."

STATE v. UPCHURCH

[332 N.C. 439 (1992)]

According to the plan, Pritchard went home on Friday, 22 July. On Saturday morning he told his parents he was leaving to go see some friends. Instead, Pritchard drove to Raleigh to pick up the defendant. In Raleigh, the defendant gave Pritchard a package of crushed sleeping pills. The two of them drove back to Washington that afternoon. Pritchard dropped defendant off at a location away from the house where defendant was to wait until Pritchard returned. Pritchard then went home and prepared hamburgers for the family lacing the food with the sleeping pills. After dinner, Pritchard told his family he was returning to Raleigh. After leaving his parents' home, Pritchard drove back to where defendant was staying. The two of them tried unsuccessfully to crush a fuse. Defendant told Pritchard the plan would not work so they returned to Raleigh. The defendant's new plan was to chop off the Von Steins' heads. The defendant wanted to purchase a machete, but no Army surplus stores were open.

The next day, defendant and Pritchard bought a hunting knife at a K-Mart in Raleigh. The new plan involved Neal Henderson driving the defendant to Washington. Chris Pritchard would stay in Raleigh to establish his alibi. Henderson needed to drive Pritchard's 1965 Mustang because defendant did not have a driver's license. If defendant was stopped while driving the Mustang without a license, then the murder could be traced back to Pritchard. The defendant was to commit the murders so that it would look like a burglary. Defendant planned to use the hunting knife and a baseball bat to carry out the murders. Henderson would wait and drive defendant back to Raleigh. To make it look like a burglary, defendant would steal some items of personal property from the house. Pritchard told the defendant where his mother always kept her purse in the kitchen and where she kept money in the bedroom. Henderson said it sounded fine to him, but it was agreed that Henderson and defendant would further discuss it.

While at Henderson's apartment, Pritchard drew a floor plan of his home for defendant and a map of his neighborhood. Both Henderson and defendant were present. Defendant was to receive $50,000 and a Porsche for his part in the plan and Henderson was to receive $50,000 and a Ferrari. Pritchard promised defendant and Henderson the money would come from his inheritance.

On Sunday night, 24 July, Henderson arrived at the campus parking lot where he had agreed to meet the defendant. Defendant

was standing by some trees and had with him a green backpack, a baseball bat, black tennis shoes and dark clothing, which included a ski mask. They arrived in Washington around 2:30 a.m. and, after locating the house, they drove around for a short while until defendant told Henderson to park the car. Defendant told Henderson to wait for him to return and that he would be back in thirty minutes.

That evening, the Von Steins had gone out to dinner. Mr. Von Stein went to bed upon returning home. At about 11:00 p.m., after checking on the many cats and her rooster, and making sure that the front and rear doors were locked, Mrs. Von Stein went upstairs to join her husband in their bedroom. She closed the door to their bedroom because their daughter was playing her radio and had a large fan running. After reading in bed, Mrs. Von Stein went to sleep around midnight.

Mrs. Von Stein was suddenly awakened by the sound of her husband's screams. Although there was much confusion, she was aware of an intruder standing at the foot of their bed. Her husband was making a series of short, piercing screams. Mrs. Von Stein reached out her hand to her husband, but was struck by some type of weapon which fractured her thumb. As Mr. Von Stein continued to scream, the intruder continued to strike both of them. She saw her husband being hit with a weapon, and then she was struck repeatedly in the head until she lost consciousness.

Momentarily regaining consciousness, Mrs. Von Stein observed the intruder standing near her feet. Again, the person struck her with an object as she was lying on the floor. She next remembered the door being closed softly and hearing thumps and "whooshes" through the wall, causing her to fear that her daughter was also being attacked.

Later, Mrs. Von Stein again regained consciousness. Although disoriented, she was aware that she was on the floor. When she reached for the bed she realized her husband's fingers were limp, but she thought she heard him breathing. She realized that she had been injured and knew she had to get help. She was able to push herself towards the telephone and pull it down on top of her chest. She called the operator who connected her with the police.

At 4:27 a.m. on 25 July 1988, a dispatcher with the Beaufort County Sheriff's Department received the call from Mrs. Von Stein.

STATE v. UPCHURCH

[332 N.C. 439 (1992)]

The dispatcher had trouble understanding her, but eventually was able to direct officers to the Von Steins' address.

Sergeant Tetterton of the Washington Police Department arrived at the scene, followed by other officers. The front door of the house was locked, but the back door was standing open. He and another officer observed a slit in the screen over one of the glass storm windows. Upon further observation, Sergeant Tetterton noticed that the glass was broken and that there was glass on the floor of the inside back porch.

Upstairs, the officers found Mrs. Von Stein lying on the floor of her bedroom with a stab wound to her chest. The telephone receiver was still in her hand. Mr. Von Stein's body was on the bed, was bloody, and had no vital signs. The officers found Angela Pritchard in her room, ten to twelve feet from her parents' room. They asked her to wait downstairs. Angela was relatively unemotional when told her mother was wounded and her stepfather dead.

Meanwhile, Neal Henderson waited in the car for thirty minutes, but defendant did not return. Henderson drove closer to the subdivision to look for defendant and about ten minutes later, he saw the defendant running towards the car. When the defendant entered the car, he told Neal, "I did it. I can't believe I did it. I never want to see that much blood again the rest of my life. Let's get out of here." Immediately, Henderson drove away and after they were on the main highway, the defendant told Henderson to stop in a dark place where the defendant could change clothes because there was blood on him. After changing, defendant threw his bloody clothes in the trunk.

Upon entering Pitt County, Henderson and the defendant stopped at a dark, secluded spot on the side of the road in order to dispose of the bloody clothes. Defendant threw the clothes, the knife and the maps on the ground, poured some gasoline over the items and set them on fire. Later, Henderson and the defendant stopped for gas and to wash the mud off the car. Defendant gave Henderson money to buy the gas, which Henderson estimated to be approximately $60 to $80 in tens and twenties.

Around 4:30 a.m. on 25 July 1988, a farmer noticed a fire on the side of Highway 264. After seeing news reports on television of the murder, the farmer notified the police, who found the remains of burned clothing, a knife, the rubber sole of a Reebok tennis

shoe, and a partially burned, hand-drawn map of the neighborhood around the Von Steins' home. A handwriting comparison later revealed that Chris Pritchard had most likely drawn the map.

The autopsy performed on Mr. Von Stein's body on 25 July 1988 revealed lacerations to the scalp in five areas which were caused by blunt impacts to the victim's head, seven stab wounds to the victim's back and one stab wound to the left chest. In addition, there were numerous bruises and scrapes consistent with defensive moves. The knife found in the burning rubble, identified as State's Exhibit No. 40, could have caused these wounds. The knife wound to the left chest entered the victim's heart and, according to the autopsy report, resulted in the victim's death within a "very few minutes."

Mrs. Von Stein's injuries included a stab wound to her chest, which caused internal bleeding and a collapsed lung. She also sustained several open cuts to her head and a fractured thumb. Because the room was dimly lit and she was not wearing her glasses, Mrs. Von Stein was unable to identify her assailant. She could only describe the person as appearing dark and bulky and being armed with a stick, club or bat. No forensically significant fingerprints were found in the house.

For many months Chris Pritchard lied to his family, friends, and authorities. In June 1989, he was arrested, and, in late December, just before the trial, he first confessed to the police and his family. In June 1989, the police also arrested Neal Henderson who cooperated with them in their investigation. At defendant's trial, Henderson testified that Pritchard and defendant first approached him two or three weeks before the attack and asked him to be the driver. He identified the baseball bat used in the assault and defendant's knapsack, which defendant carried that night and left in the Von Stein home. Witnesses for defendant testified that they had never seen defendant with the knapsack.

At the penalty phase, one of defendant's high school teachers testified that defendant had been identified as a gifted student, had attended Governor's School, and had been a member of various school clubs, including the engineering, mathematics, yearbook, and African-American history clubs. A psychologist testified that his testing of defendant revealed an absence of violent tendencies and the presence of a primary mode of dealing with situations by denying feelings and thoughts. Defendant's mother testified that defend-

ant had been raised on a farm as part of a close, church-going family. His parents divorced when defendant was eighteen years old.

## JURY SELECTION AND GUILT PHASE

### I.

Defendant's first assignment of error concerns the constitutional rights to due process, an impartial jury, and the Eighth Amendment right to enhanced reliability in a capital case. Defendant here contends that the trial court committed reversible constitutional error during jury selection by (1) permitting the State to express repeatedly the opinion that a penalty phase was highly likely; (2) failing to excuse all potential jurors who heard the State assert that jurors who sat in the case would "look the monster in the eye"; (3) permitting the State to refer to defendant and the two co-defendants alike as "charged, indicted co-conspirators"; and (4) comparing the contingent phases of bifurcated trials to the halves of a football game. Defendant contends that, in these exchanges, the State repeatedly and improperly stated its opinion that defendant was guilty. Defendant contends that the tactics of the State and the conduct of the trial court implicitly communicated to the jury that defendant was probably or certainly guilty resulting in a jury unfairly primed to vote for guilt.

### A.

[1] Defendant contends that the prosecutor prejudiced defendant by saying to potential jurors concerning the imposition of the death penalty in this case "there is a very good possibility that you may have to answer that question." However, the record also shows that prior to this statement, the prosecutor asked the members of the panel if they were aware that

> if and when Mr. Upchurch were [sic] found guilty of murder in the first degree that you, if you were selected to sit upon the jury, that you would be called upon to participate, sit in on the second phase of that trial, that is the penalty phase of that trial?

It is apparent from the transcript that the prosecutor was explaining the distinction between the two phases of a capital trial and was stressing the importance of each phase. The State did not inform the jury that a sentencing phase was certain in defendant's trial.

The trial court overruled defendant's objections to the State's comments. Defendant then moved to excuse all venire persons who had heard the remarks. Defendant argues that error occurred not only as to the jurors who were directly questioned, but also as to jurors in the venire who were listening and who eventually sat on defendant's jury. The trial court denied the motion, noting that it had given an instruction to disregard and that it would allow inquiry into the effectiveness of the instruction with subsequent persons called to the box. Defendant then moved for a mistrial which was denied.

On appeal, defendant argues that the curative instruction was not sufficient to remove the prejudice in this case, but he failed to show any prejudice he suffered in regards to the State's comments and the ineffectiveness of the court's instruction. When a court properly instructs jurors not to consider certain statements, any prejudice is ordinarily cured. *State v. Drdak*, 330 N.C. 587, 411 S.E.2d 604 (1992); *State v. Smith*, 301 N.C. 695, 272 S.E.2d 852 (1981). The statements and questions by the State were not of such a highly incriminating nature as to make the court's curative instruction insufficient to avert any prejudice. *State v. Silva*, 304 N.C. 122, 282 S.E.2d 449 (1981). *See also State v. Gardner*, 311 N.C. 489, 319 S.E.2d 591 (1984). The trial court properly instructed the jurors, and, therefore, the defendant was not prejudiced. *See generally Drdak*, 330 N.C. 587, 411 S.E.2d 604; *State v. Bullard*, 312 N.C. 129, 322 S.E.2d 370 (1984); *State v. Pruitt*, 301 N.C. 683, 273 S.E.2d 264 (1981).

B.

[2] Defendant excepted to the prosecutor's comment during jury selection that a juror would have to "look the monster in the eye." The trial court sustained his objection, granted the motion to strike, and instructed that juror and other members of the panel to disregard the statement.

As we have stated above, and as this Court has held in *Pruitt*:

Ordinarily, when incompetent or objectionable evidence is withdrawn from the jury's consideration by appropriate instructions from the trial judge, any error in the admission of the evidence is cured. *E.g., State v. Covington*, 290 N.C. 313, 226 S.E.2d 629 (1976). In like manner, improper argument or remarks by counsel are usually cured by appropriate in-

structions by the court to the jury. *State v. Sparrow*, 276
N.C. 499, 173 S.E.2d 897 (1970). Assuming, *arguendo*, that the
testimony about which defendant complains was erroneously
admitted, there was no prejudice because of the curative in-
structions which the jury received.

*Pruitt*, 301 N.C. at 688, 273 S.E.2d at 268. Because the trial court
properly instructed the jurors in his favor, defendant was not preju-
diced. *See generally Drdak*, 330 N.C. 587, 411 S.E.2d 604; *Bullard*,
312 N.C. 129, 322 S.E.2d 370; *Pruitt*, 301 N.C. 683, 273 S.E.2d 264.

C.

[3] Defendant also objected to the State's remarks that defend-
ant's claims equate him with his co-defendants, who had already
pled guilty. The trial court allowed the prosecutor to ask potential
jurors whether they could weigh the testimony of two potential
witnesses as they would other witnesses even though they had
entered a plea arrangement. The facts behind the plea bargains
between the State and Pritchard and Henderson were fully aired
during the trial. Defendant fails to show any prejudice resulting
from the State's comparison of defendant to the two co-defendants.
*Bullard*, 312 N.C. 129, 322 S.E.2d 370.

D.

[4] The trial court, when describing the proceeding to the poten-
tial jurors, used the metaphor that the two phases of a capital
case are like two halves of a football game. Defendant contends
that the trial court thereby unwittingly communicated an opinion
that this case would have a penalty phase, when the occurrence
of a penalty phase is actually contingent. However, the trial court
stated that the two phases of a capital trial "may" be seen like
two halves of a football game. The defendant acknowledges that
the trial court used the term "may." This comparison was not
an expression of an opinion. *See State v. Young*, 324 N.C. 489,
380 S.E.2d 94 (1989), wherein this Court held that the trial court
did not express an opinion on defendant's guilt by instructing the
jury that the evidence tended to show that defendant confessed.

II.

[5] Defendant's second assignment of error concerns the trial court's
failure to adequately respond to the potential for unconstitutional
prejudice. Near the end of the State's evidence, the prosecutor

STATE v. UPCHURCH

[332 N.C. 439 (1992)]

used the words "probation officer" during a bench conference. The defendant argues that the jury would have understood the bench conference was in reference to the State's next witness. However, the evidence of defendant's prior convictions had not yet been allowed into evidence.

Near the end of the State's case, the trial court asked the State for the identity of its next witness. The trial court directed counsel to approach the bench when the State requested a lunch recess to think about which witness to call next.

Defendant contends error was committed when the trial court failed to grant defendant's motion for a mistrial after the words "probation officer" were spoken within the hearing of the jury during a bench conference following a query by the trial court as to who would testify next for the State. The following exchange between the trial court and the prosecuting attorney took place prior to the bench conference:

THE COURT: Thank you. Mr. Norton, who is your next witness going to be?

MR. MASON: Your Honor, I think we are going to have to discuss that during the lunch break.

THE COURT: Let me see you gentlemen up here, please.

During the bench conference that followed, the words "probation officer" or "parole officer" were spoken so that certain individuals not participating in the bench conference could hear them. This is the basis of defendant's claim of prejudicial error. The transcript next indicates that the trial court said:

THE COURT: Mr. Norton, do not speak so that you can be heard by the jury.

Members of the jury, if any of you have heard anything that Mr. Norton said you put it out of your minds immediately. You pay no attention to it. And it must not influence your verdict upon any of these matters that will come to your consideration in this case. Can all of you do that? If you can't, let me know about it right now.

(No response from the jurors)

THE COURT: Members of the jury, let me ask you one other question at this point in time. I just gave you that in-

struction that you were not to consider anything that you might have heard during the bench conference. Did any of you hear anything that was said at the bench conference? If you did I want you to raise your hand right now. If you heard any remarks made by counsel or anything that may have been said by me other than what I directed to you when I gave you that instruction, please raise your hand right now.

(No response from the jurors)

After the jury was dismissed, defendant moved for a mistrial on the grounds that Mr. Norton had, during the bench conference, referred to a potential witness as a "probation officer." The motion was denied.

After the lunch recess, the trial court permitted defendant to make an offer of proof relevant to his pre-recess motion for mistrial. The offer consisted in part of testimony by Kathleen Davis and Carolyn Richardson. Davis testified that she had been seated on the third row from the back of the courtroom during the bench conference and that she had heard someone facing the bench distinctly say the words "probation officer." Richardson testified that she was seated on the second to last row on the opposite side of the courtroom from Davis and that she heard the same phrase. Both testified that they did not know who had spoken the words nor to whom the words referred. Defendant also requested and received an affidavit from the court reporter, in which she said that she was eight feet from the bench and nine feet from the nearest juror, that she heard most of the conference, and that the words "probation officer" were louder and more distinct than the other words, and that she knew that the District Attorney had made the statement. The trial court again denied the motion for mistrial. The State did not call the probation officer.

Regarding the standard of review for a denial of a motion for a mistrial, this Court has stated:

It is well settled that the decision of whether to grant a mistrial rests in the sound discretion of the trial judge and will not be disturbed on appeal absent a showing of an abuse of discretion. . . . [A] trial court may be reversed for an abuse of discretion only upon a showing that its ruling was so arbitrary that it could not have been the result of a reasoned decision.

*State v. Barts*, 316 N.C. 666, 682, 343 S.E.2d 828, 839 (1986) (citations omitted).

Defendant argues that the witnesses' testimony during the voir dire indicates that it is highly likely that the jury also heard the words "probation officer" and knew to whom the words referred. However, the testimony and the affidavit in support of this motion do not indicate that any of the witnesses heard the probation officer referred to by name. Neither witness questioned knew whether the probation officer referred to was Chris Pritchard's, Neal Henderson's, or the defendant's probation officer. The trial court told the jurors that if they heard anything they should disregard it, and he asked if any in the jury would be unable to do so. None of the jurors said that they would be unable to do so. The trial court subsequently asked the jurors whether they had heard anything at the conference and no juror said that he had. As stated above, a mistrial on review will be granted only where abuse of discretion is found. There is sufficient evidence in the record to support the trial court's ruling that the mishap did not sufficiently prejudice defendant's case to warrant a mistrial. After reviewing the record, we cannot say that the ruling was so arbitrary that it was not the result of a reasoned decision. Therefore, we overrule this assignment of error.

III.

[6] Defendant next assigns error to the trial court's unrecorded bench and in-chambers conferences and one communication with a juror. Defendant contends these occurrences violated his right to presence at each stage of a capital trial under Article I § 23 of the North Carolina Constitution. During jury selection and trial, the trial court conducted seventy-eight unrecorded bench conferences and two unrecorded chambers conferences with counsel. The record also shows one unrecorded exchange with a juror.

A.

The issue raised by this assignment of error is controlled by *State v. Buchanan*, 330 N.C. 202, 410 S.E.2d 832 (1991). In *Buchanan*, this Court held that a defendant's state constitutional right to be present at all stages of his capital trial was not violated when the trial court conducted bench conferences with counsel for both parties while the defendant was present in the courtroom. In that case, in rejecting the contention that a defendant's constitutional

right included his personal presence at a bench conference, this Court held:

> Though defendant himself did not attend the conferences in this case, we conclude that the trial court's bench conferences with defense counsel and counsel for the State did not violate defendant's state constitutional right to be present at all stages of his trial. As stated above, defendant was personally present in the courtroom during the conferences. Further, and perhaps more importantly, his actual presence was not negated by the trial court's actions. At each of the conferences defendant was represented by his attorneys. Defendant was able to observe the context of each conference and inquire of his attorneys at any time regarding its substance. Through his attorneys defendant had constructive knowledge of all that transpired. Following the conferences defense counsel had the opportunity and the responsibility to raise for the record any matters to which defendant took exception. At all times defendant had a first-hand source of information as to the matters discussed during a conference. It also is relevant that bench conferences typically concern legal matters with which an accused is likely unfamiliar and incapable of rendering meaningful assistance. Other conferences typically deal with administrative matters that are nonprejudicial to the fairness of defendant's trial. In addition, such conferences do not diminish the public interest associated with defendant's right to presence. Unlike the excusal of prospective jurors following *ex parte* communications, in this case defendant, through his attorneys, had every opportunity to inform the court of his position and to contest any action the court might have taken.

*Buchanan*, 330 N.C. at 223, 410 S.E.2d at 844.

In the instant case, the defendant has not shown or contended that he was absent from the courtroom during these proceedings. The defendant acknowledges that his counsel was present at all of the bench conferences and in-chambers conferences. The defendant fails to show that his actual presence at the bench conferences or at the in-chambers conferences would have added to his defense. Defendant fails to demonstrate, and the record does not in any way suggest, that the bench conferences conducted implicated defendant's confrontation rights or that his presence at conferences would have had a reasonable substantial relation to his opportunity

to defend. He has not met his burden of establishing that any of the conferences concerned his rights of confrontation or that his presence at any of the conferences was necessary to insure his opportunity to defend himself. Further, a number of these unrecorded bench conferences were conducted at the request of defense counsel. Thus, defendant's assignments of error relating to state constitutional claims are without merit.

Defendant also asserts that his absence from the unrecorded bench conferences violated his Sixth Amendment right under the Constitution of the United States. Defendant failed to raise this issue before the trial court, therefore, this issue is deemed waived. *State v. Mitchell*, 317 N.C. 661, 346 S.E.2d 458 (1986). Furthermore, this very contention was rejected by this Court in *Buchanan*. This assignment of error is overruled.

B.

[7] With regard to the single asserted contact with a juror outside the presence of the defendant, the State contends the record does not show that the trial court's contact with the juror was improper. The record in this regard clearly shows this occurrence was raised by the trial judge himself in speaking directly to the jurors in open court, and the record clearly shows the full nature and extent of the communication. The record reflects:

> THE COURT: If any of you [the jury members] need some sort of statement or certificate, or letter to your employer or employers to tell them where you are so that they don't get unhappy and upset and the like, if you would let us know about that, we will be happy to supply it to you, either Mrs. Thompson, the clerk, or if necessary, I will be happy to sign a letter myself as I did for Mrs.—I can't remember your name.

> JUROR: Green.

> THE COURT: I will be happy to do that if any of you need such. If at the first recess, if you will just let Ms. Andrews know about it, we'll be happy to prepare whatever you need in that regard.

Again, a few moments later, the Court stated:

> But if any of the others of you need such, again, if you will let Ms. Andrews know, we'll be happy to assist you with that.

The record is thus abundantly clear as to what this complained-of communication was all about—that, consistent with the customary practice of our trial courts to ease employed jurors' stress during jury duty, a letter was signed for a juror, Juror Green, for the benefit of that juror and her employer. This was the full sum and substance of this communication or contact. There was no objection or request by defense counsel to examine the letter. Defendant has therefore failed to meet his burden of establishing constitutional error. *See Buchanan*, 330 N.C. 202, 410 S.E.2d 832. Even assuming that there was error in the contact with the juror, the error was harmless beyond a reasonable doubt. *See State v. Robinson*, 330 N.C. 1, 409 S.E.2d 288 (1991).

## IV.

[8] Defendant also assigns error to his conviction on the first-degree burglary charge. In essence, defendant contends that the agreement embodied in the conspiracy between himself and Pritchard furnished authorized consent to enter the home and therefore established his defense to first-degree burglary. Defendant asserts that the evidence was uncontradicted that Chris Pritchard was a resident of the Lawson Road home in Washington and, therefore, claims that the State failed to prove that Pritchard was without the capacity to consent to entry by others. Thus, defendant maintains, the State failed to show Pritchard lacked authority to grant defendant's entry and, therefore, the requisite wrongful entry for a first-degree burglary conviction was not and could not be established.

The issue in this assignment of error is whether entry of the Von Stein house was without the consent of anyone authorized to give consent. Defendant argues that, because Pritchard was a resident of the home, he inherently had the ability to authorize defendant's entry. This Court has considered this argument in *State v. Meadows*, 306 N.C. 683, 295 S.E.2d 394 (1982), *rev'd on other grounds*, 307 N.C. 628, 300 S.E.2d 351 (1983). In that case the Court held:

'The constituent elements of burglary in the first degree are: (1) the breaking (2) and entering (3) in the nighttime (4) into a dwelling house or a room used as a sleeping apartment (5) which is actually occupied at the time of the offense (6) with the intent to commit a felony therein.' *State v. Person*, 298 N.C. 765, 768, 259 S.E.2d 867, 868 (1979). The breaking

and entry of the dwelling must be without the consent of anyone authorized to give consent. *State v. Boone*, 297 N.C. 652, 256 S.E.2d 683 (1979); *State v. Friddle*, 223 N.C. 258, 25 S.E.2d 751 (1943); *State v. Goffney*, 157 N.C. 624, 73 S.E. 162 (1911); *State v. Rowe*, 98 N.C. 629, 4 S.E. 506 (1887); *State v. Tolley*, 30 N.C. App. 213, 226 S.E.2d 672, *disc. rev. denied*, 291 N.C. 178, 229 S.E.2d 691 (1976); Annot., *Burglary—Entry with Consent*, 93 A.L.R. 2d 531 (1964).

306 N.C. at 689-90, 295 S.E.2d at 398.

As a child who had a room in his parents' home, Pritchard's authority was not unlimited. Although one may consent to entry by another into an occupied dwelling, consent as a defense is not established until authority to consent is determined to be valid. "[I]t is no defense to a burglary charge where defendant is given consent to enter by one having no authority to do so." *Smith v. State*, 477 N.E.2d 857, 863 (Ind. 1985) (citing *State v. Tolley*, 30 N.C. App. 213, 226 S.E.2d 672 (1976) ).

Chris Pritchard was not the owner of the home, thus any authority he may have had depends upon the circumstances under which consent was given or implied. Just as circumstances can imply authority to consent to entering the home, circumstances can also indicate, or clearly show, an inability to give valid consent. While it may have been proper for Pritchard to consent to a friend entering the home during normal visiting hours to wait for his arrival, it does not necessarily follow that Pritchard would have had the same authority to give consent under other circumstances.

Under the facts of this case, it cannot be said that either Pritchard or defendant had any good-faith, reasonable belief that Pritchard had authority to give defendant permission to enter his parents' home in the middle of the night when Pritchard was not there. When Pritchard began to plot his parents' death, both he and defendant could not reasonably have believed that Pritchard had any authority to give valid consent for entry for the purposes of their conspiracy. Any authority he may have had was exceeded and any implied consent was invalid from its inception. Therefore, as Pritchard had exceeded any authority he may have had, entry of the dwelling by defendant clearly was without the consent of anyone authorized to give consent. As in *Meadows*, we conclude this assignment of error and contention is without merit in light of the evidence. Since we find no error in and uphold the first-

**STATE v. UPCHURCH**

[332 N.C. 439 (1992)]

degree burglary conviction, defendant's further contention that his felonious larceny conviction (as dependent on his burglary conviction) should be reduced to misdemeanor larceny, is also meritless and fails.

PENALTY PHASE

V.

[9] In his next assignment of error, defendant contends he is entitled to a new sentencing proceeding under *McKoy v. North Carolina*, 494 U.S. 433, 108 L. Ed. 2d 369 (1990). We agree.

In *McKoy*, the United States Supreme Court held unconstitutional, under the eighth and fourteenth amendments of the federal constitution, jury instructions directing that, in making the final determination of whether death or life imprisonment is imposed, no juror may consider any circumstance in mitigation of the offense unless the jury *unanimously* concludes that the circumstance has been proved. Our review of the record reveals, and the State agrees, that the defendant's jury was so instructed. The trial court instructed the jury to answer "no" to each mitigating circumstance that it failed to find unanimously. The issue, then, is whether the *McKoy* error can be deemed harmless. "The error . . . is one of federal constitutional dimension, and the State has the burden to demonstrate its harmlessness beyond a reasonable doubt." *State v. McKoy*, 327 N.C. 31, 44, 394 S.E.2d 426, 433 (1990); N.C.G.S. § 15A-1443(b) (1988).

Issue No. 2 stated: "Do you unanimously find from the evidence the existence of one or more of the following mitigating circumstances?" Twelve possible mitigating circumstances were then listed. The trial court instructed that the jury must unanimously find by the preponderance of the evidence at least one of these mitigating circumstances before Issue No. 3 could be considered. Indeed, the jury found five mitigating circumstances unanimously, while rejecting seven. Issue No. 3 stated: "Do you unanimously find beyond a reasonable doubt that the mitigating circumstance or circumstances found by you is, or are, insufficient to outweigh the aggravating circumstance or circumstances found by you?" The trial court instructed the jury that if it did not unanimously find beyond a reasonable doubt that the mitigating circumstances were insufficient to outweigh the aggravating circumstances, it should answer Issue No. 3 "no" and recommend a life sentence. If it found

unanimously beyond a reasonable doubt that the mitigating circumstances were insufficient to outweigh the aggravating circumstances, the jury was to answer "yes" and proceed to Issue No. 4. Issue No. 4 stated: "Do you unanimously find beyond a reasonable doubt that the aggravating circumstance or circumstances found by you is, or are, sufficiently substantial to call for the imposition of the death penalty when considered with the mitigating circumstance or circumstances present from the evidence?"

Defendant contends that there was evidence in the case to support a finding of all the rejected mitigating circumstances as well as ones not expressly submitted. Defendant argues that the trial court's instruction on Issue No. 4 did not cure the faulty instructions on Issue No. 2 and Issue No. 3 because the jury would not have reached Issue No. 4 if it had found at Issue No. 3 that the mitigating circumstances were sufficient to outweigh the aggravating circumstances. In light of "the constitutional importance of preserving the jury's ability to consider under proper instructions all evidence proffered by a capital defendant that could reasonably mitigate the sentence to something less than death . . . it would be a rare case in which a *McKoy* error could be deemed harmless." *State v. McKoy*, 327 N.C. at 44, 394 S.E.2d at 433 (citation omitted). This is not the rare case contemplated by *McKoy*.

The State concedes that there was error in the instructions pursuant to the holding in *McKoy v. North Carolina*. In addition, the State is unable to distinguish this Court's decisions in *State v. Stager*, 329 N.C. 278, 406 S.E.2d 876 (1991); *State v. Huff*, 328 N.C. 532, 402 S.E.2d 577 (1991); and *State v. McKoy*, 327 N.C. 31, 394 S.E.2d 426. Therefore, the State cannot meet its burden of establishing that the error was harmless beyond a reasonable doubt.

A new sentencing hearing, under *McKoy*, is required.

## VI.

[10] In his final assignment of error, defendant contends that the trial court violated defendant's right to be free from double jeopardy. The trial court submitted to the jury during the penalty phase the aggravating circumstance that the offense was committed while defendant was engaged in the commission of a burglary. The jury had rejected the felony murder rule as a theory of guilt

for first-degree murder in the first phase of the trial. Defendant contends this precludes admission of the same issue under the same burden of proof in the penalty phase.

Defendant's argument ignores the fact that the jury, in the guilt phase, convicted defendant separately of burglary *and* of first-degree murder on the basis of premeditation and deliberation. Therefore, *State v. Cherry*, 298 N.C. 86, 257 S.E.2d 551 (1979) controls. In *Cherry*, the Court held that when a defendant is convicted of first-degree murder under the felony murder rule, the trial court shall not submit to the jury at the sentencing phase an aggravating circumstance regarding the underlying felony. There it was held improper to submit the aggravating circumstance in N.C.G.S. § 15A-2000(e)(5) when the defendant was engaged in the commission of one of the enumerated felonies, except where the defendant was convicted of first-degree murder on the basis of his premeditation and deliberation. This assignment of error is without merit.

For the reasons stated, we find no error in the guilt phase of defendant's trial, but remand for a new capital sentencing proceeding.

No error in the guilt phase;

Death sentence vacated and case remanded for new capital sentencing proceeding.