STATE OF NORTH CAROLINA v. REGINALD PATTERSON

No. 29A93

(Filed 28 January 1994)

1. **Criminal Law § 762 (NCI4th)— first-degree murder— instructions—reasonable doubt—moral certainty**

    There was no error in a noncapital first-degree murder prosecution where the trial court instructed the jury that "[it] must be fully satisfied, entirely convinced or satisfied to a *moral certainty* of the Defendant's guilt." The use of the term "moral certainty" alone—not in combination with "grave uncertainty," "actual substantial doubt," or terms of similar import— does not raise a reasonable likelihood that the jury applied the instruction to allow a finding of guilt based on a degree of proof below that required by the Due Process Clause.

    **Am Jur 2d, Trial § 832.**

2. **Criminal Law § 753 (NCI4th)— first-degree murder— instructions—reasonable doubt—substance of requested instruction**

    The trial court did not err in a noncapital first-degree murder prosecution by not giving defendant's requested instruction that "in a criminal case the jury is at full liberty to acquit the defendant if it is not satisfied from all the evidence that the defendant's guilt has been proven beyond a reasonable

doubt." It is sufficient if the trial court gives requested instructions in substance; here the instructions given made it "overly clear" that the jury could acquit defendant if it found that the State failed to prove its case beyond a reasonable doubt.

**Am Jur 2d, Trial §§ 827 et seq.**

3. **Criminal Law § 787 (NCI4th) — first-degree murder — requested instructions on accident — given in substance**

The trial court did not err in a noncapital first-degree murder prosecution in its instruction on the law of accident where, considering the instructions in their entirety, the trial court explained the law sufficiently and substantially in accordance with defendant's request.

**Am Jur 2d, Trial §§ 726 et seq.**

4. **Homicide § 246 (NCI4th) — first-degree murder — premeditation and deliberation — evidence sufficient**

The trial court did not err in a noncapital first-degree murder prosecution by denying defendant's motion to dismiss for insufficient evidence where defendant contended at trial that he had killed the victim accidentally and on appeal that she was shot during a quarrel, but the physical evidence contradicted both versions, there was physical evidence from which the jury could reasonably infer that defendant intentionally pointed a shotgun at the victim at close range and intentionally pulled the trigger, and there was other evidence which allowed the jury to find that defendant intentionally killed the victim with malice and with premeditation and deliberation.

**Am Jur 2d, Homicide §§ 437 et seq.**

5. **Criminal Law § 113 (NCI4th) — first-degree murder — custodial statement — not disclosed by State — no prejudicial error**

There was no prejudicial error in a noncapital first-degree murder prosecution where the State violated discovery statutes in that defendant filed a request for voluntary discovery, the State filed a copy of a written statement defendant gave to an officer after having been advised of his rights, and later filed a supplementary discovery of oral statements made to another officer. The State in its initial response omitted the *essence* of the first version proffered by defendant and thus failed to disclose the substance of defendant's custodial state-

ment. The subsequent discovery response did not "cure" the error because the State failed to refer back to its initial omission or otherwise inform defendant that the written record of his custodial statement, earlier disclosed, was incomplete; furthermore, unlike the initial response, the supplementary discovery response did not indicate that the State intended to use the evidence at trial. The error was harmless because defendant had elicited the same evidence earlier in the trial; defendant could have moved to suppress the statement at issue during the trial; there is no indication in the record that the statement was not voluntarily and understandingly made; and defendant fully availed himself of the opportunity to question both officers to whom statements were made and was free to argue to the jury the exculpatory implications of his multiple versions of how the murder weapon came to discharge.

**Am Jur 2d, Depositions and Discovery §§ 426, 427.**

Appeal of right by defendant pursuant to N.C.G.S. § 7A-27(a) from a judgment imposing a sentence of life imprisonment entered by Allsbrook, J., at the 2 August 1992 Criminal Session of Superior Court, Halifax County, upon a jury verdict finding defendant guilty of first-degree murder. Heard in the Supreme Court 17 September 1993.

*Michael F. Easley, Attorney General, by David Roy Blackwell, Special Deputy Attorney General, for the State.*

*Nora Henry Hargrove for defendant appellant.*

WHICHARD, Justice.

Defendant was indicted for one count of first-degree murder. After a noncapital trial, a jury found defendant guilty thereof, and the trial court sentenced defendant to the mandatory term of life imprisonment. On appeal, defendant brings forward four assignments of error. After a thorough review of the record, we conclude that defendant received a fair trial, free of prejudicial error.

The State presented evidence that tended to show the following:

Sometime in the early morning hours of 29 February 1992, Tonya Renee Mitchell suffered a fatal shotgun wound to her head. She died at Duke University Medical Center on 2 March 1992.

Officer Johnny Manley of the Littleton Police Department testified that shortly after midnight on 29 February 1992, he waited in the New Dixie Mart on Highway 15 while the clerk closed the store and completed the deposit. At about 1:05 a.m. defendant drove into the parking lot, walked to the door and knocked on the window, and motioned to Manley to come outside. Manley did so. Defendant told Manley he had shot his girlfriend through the head and thought he had killed her. Manley asked where the shooting had occurred; defendant replied that it occurred at his residence, adding that he started to leave, changed his mind, and threw the gun in Thelma Lake. Manley arrested defendant at that time and drove defendant to his home.

Manley knocked on the door of defendant's home, but no one responded. Hearing moaning from the back of the house, Manley entered and walked through the living room towards an open door. Entering the room, Manley observed a young woman lying on the floor behind the bed, her face to the dresser and wall and her body in a slumped-over position. A suitcase containing clothes was on the bed. Manley also observed blood all around the woman's head and on the dresser and wall. He later identified the woman as Tonya Renee Mitchell.

On cross-examination Manley noted that he interpreted defendant's statement as a request for assistance for the victim. Manley observed no blood, torn clothes, bruises, scratches, or other evidence that defendant had been in any kind of argument or fight, and defendant was cooperative. Manley did not advise defendant of his rights, but asked him no questions.

Halifax County Deputy Sheriff Robby Hedgepath testified that he arrived at the scene at approximately 1:15 a.m. Hedgepath noticed defendant sitting in Manley's car surrounded by a crowd, and he walked outside to clear the area. He overheard defendant tell the people around the car that he did not mean to shoot the victim. Hedgepath testified on cross-examination that later, during the custodial interview at the police station, defendant said that he threw the gun down on the bed and it went off, the shot hitting the left side of the victim's face.

Detective Henry Whittle, an investigator with the Halifax County Sheriff's Department, testified that he arrived at the scene of the shooting shortly after 1:00 a.m. He observed defendant in the back of a patrol car. Defendant told Whittle he had just killed

his girlfriend and wanted to see her. Whittle instructed defendant to calm down and proceeded into the home to complete his investigation there. Whittle later drove to the Littleton Police Department where he met with defendant around 1:50 a.m.

Whittle told defendant he wished to speak with him, and defendant agreed to talk to Whittle. Defendant appeared to be coherent and not under the influence of any narcotic or controlled substance. He did not appear to be confused, sleepy, hysterical, upset or visibly emotional. Whittle advised defendant of his rights from a printed Miranda rights form while defendant read along; at 2:02 a.m. defendant signed the form indicating he understood his rights. Defendant indicated he was not under the influence of any alcoholic beverage or drugs. He never requested any refreshment or break and never asked to stop the conversation. Whittle made no promises.

Defendant gave Whittle the following account of the shooting:

His girlfriend, Tonya Mitchell, left to go to work, and defendant went to the Green Store. Later, she returned from work and went to the Green Store. Defendant was behind the store when she arrived. She came around back, they exchanged words, and she returned to her car and drove back to their residence. Defendant followed her in his vehicle.

At the house defendant removed his shotgun from the rear floor of his vehicle. When he got to the bedroom, the victim was packing her clothes to move. Defendant threw the shotgun onto the bed and the shotgun went off. He then took the shotgun, drove to Thelma Lake, and threw the gun into the water. While driving back to Littleton on the way to Washington, D.C., defendant saw Officer Manley at a convenience store.

Whittle testified that he told defendant he was going to take a written statement and he wanted defendant to tell him the truth and sign the statement when they finished. Defendant made the following statement to Whittle:

On the 28th of February, 1992, I, Reginald Patterson, and my girlfriend, Tonya Renee Mitchell, was at our house around 11:15 p.m., and she, Tonya, went to work at the Bibb Company in Roanoke Rapids, N.C. Before she left she told me, "Don't stay out to [sic] long Reginald." So, I went down to the Green Store like you are going toward Hollister on Highway #4 and then she came up while I was behind the store taking a leak.

My brother came up and told me she was here at the store and then I told my brother, Earnest, to take my keys to my brother, William, and when he came back around the store to tell me that she already knew I was behind the store she followed my brother back and when she got there told me, "You sorry mother f——— you," and then she left and I got into my car and I followed her to my house. When I got to the house she was getting her clothes, I guess to leave. When I got out of my car I got my 20 gauge shotgun out of the floor of the rear of my car and went into the house and she was getting her clothes and I saw her getting her clothes and I had the shotgun in my hands and I had the gun up in the air and had it with one hand. I brought the gun down to throw the gun down and the gun went off and shot her. I didn't mean to shoot her cause I love her. Then, I walked back through the house and told my mother that I have just shot Tonya and then I went on out the house and got into my car and took the shotgun with me and drove to Littleton. I was leaving to go to Washington, D.C., and I drove to Thelma to the Thelma Bridge where I threw the shotgun into the river. Then, I started to leave and go to D.C. but I turned around and drove back to Littleton, N.C. When I got to Littleton I saw Officer Manley at the New Dixie Mart and I stopped and told him what had happen.

Willie McWilliams testified that, while in the Halifax County Jail with defendant, defendant asked him to destroy the gun — melt it down — if McWilliams got out. Defendant told McWilliams he could find the gun in the left hand side ditch near Faison Store Cleaners. Defendant told him that without the murder weapon there might not be a case. McWilliams told certain detectives about defendant's request.

Captain Charles E. Ward, Halifax County Sheriff's Department, testified that based on McWilliams' directions, he found a sawed-off shotgun in a clearing near the ditch beside Faison Store Cleaners. The shotgun was identified by other witnesses as belonging to defendant.

S.B.I. Special Agent William Turner, Jr., of the Firearm and Tool Mark Section, testifying as an expert in firearms' identification, stated that he examined the shotgun and 20 gauge shotgun shell found in the ditch, as well as the pellets removed from the

victim's body. Turner identified the shell as 20 gauge number 6 shot, which would have contained 197 pellets.

Turner test-fired the shotgun using 20 gauge shells. It fired in the normal manner, by chambering the shell, closing the bridge latch, pulling the hammer back, and releasing it by pulling the trigger. The trigger pull force on the shotgun ranged from three to four pounds. Turner attempted to fire the weapon by other than normal means. It would sometimes fire when Turner pulled the hammer back almost until the gun cocked and then released it, or when he pulled the trigger and struck the hammer with a moderate blow from a heavy object. Hitting the shotgun on the floor with hard force produced no discharge, nor did any other blows or drops.

Dr. Robert L. Thompson, the forensic pathologist who performed the autopsy, testified as an expert in the field of forensic pathology. Thompson observed a shotgun wound to the left temporal area, or left ear area, into the brain. He observed no other wounds on the face or head. Based on the spread of the shotgun pellets, Thompson concluded the wound was from a shotgun fired at close range. In his opinion, the victim died of a shotgun wound to the head.

Defendant did not testify or present evidence.

[1] In his first assignment of error, defendant contends that the trial court erred by giving a reasonable doubt instruction that reduced the State's burden of proof below the standard required by the Due Process Clause. At the charge conference defendant tendered a written request for the following instruction: "In a criminal case the jury is at full liberty to acquit the defendant if it is not satisfied from all the evidence that the defendant's guilt has been proven beyond a reasonable doubt." The trial court noted that "it's overly clear that the State has a burden of proof beyond a reasonable doubt," declined to give the requested instruction, and subsequently instructed the jury:

> The State must prove to you that the Defendant is guilty beyond a reasonable doubt. Of course a reasonable doubt of a Defendant's guilt also might arise from a lack or insufficiency of the evidence. However, a reasonable doubt is not a vain, imaginary or fanciful doubt but it is a sane, rational doubt. Proof beyond a reasonable doubt means that you must be

**STATE v. PATTERSON**

[335 N.C. 437 (1994)]

fully satisfied, entirely convinced or satisfied to a moral certainty of the Defendant's guilt.

Defendant relies upon *Cage v. Louisiana*, 498 U.S. 39, 112 L. Ed. 2d 339 (1990). In *Cage*, the United States Supreme Court held that the following instruction violated the Due Process Clause:

If you entertain a reasonable doubt as to any fact or element necessary to constitute the defendant's guilt, it is your duty to give him the benefit of that doubt and return a verdict of not guilty. Even where the evidence demonstrates a probability of guilt, if it does not establish such guilt beyond a reasonable doubt, you must acquit the accused. This doubt, however, must be a reasonable one; that is one that is founded upon a real tangible substantial basis and not upon mere caprice and conjecture. *It must be such doubt as would give rise to a grave uncertainty*, raised in your mind by reasons of the unsatisfactory character of the evidence or lack thereof. A reasonable doubt is not a mere possible doubt. *It is an actual substantial doubt*. It is a doubt that a reasonable man can seriously entertain. What is required is not an absolute or mathematical certainty, but a *moral certainty*.

*Cage*, 498 U.S. at 40, 112 L. Ed. 2d at 341-42 (emphasis in original). The Supreme Court focused on the combination of terms, stating:

The charge did at one point instruct that to convict, guilt must be found beyond a reasonable doubt; but it then equated a reasonable doubt with a "grave uncertainty" and an "actual substantial doubt," and stated that what was required was a "moral certainty" that the defendant was guilty. It is plain to us that the words "substantial" and "grave," as they are commonly understood, suggest a higher degree of doubt than is required for acquittal under the reasonable doubt standard. When those statements are then considered with the reference to "moral certainty," rather than evidentiary certainty, it becomes clear that a reasonable juror could have interpreted the instruction to allow a finding of guilt based on a degree of proof below that required by the Due Process Clause.

*Id.* at 41, 112 L. Ed. 2d at 342.

In reviewing an instruction for *Cage* error, we inquire " 'whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way' that violates the Constitution." *Estelle*

*v. McGuire*, 502 U.S. ---, ---, 116 L. Ed. 2d 385, 399 (1991) (quoting *Boyde v. California*, 494 U.S. 370, 380, 108 L. Ed. 2d 316, 329 (1990) ). To satisfy this "reasonable likelihood" standard, a defendant must show more than a "possibility" that the jury applied the instruction in an unconstitutional manner, but need not establish that the jury was "more likely than not" to have misapplied the instruction. *Boyde*, 494 U.S. at 380, 108 L. Ed. 2d at 329.

In *State v. Bryant*, 334 N.C. 333, 432 S.E.2d 291 (1993), we reviewed the following instruction for *Cage* error:

> When it is said that the jury must be satisfied of the defendant's guilt beyond a reasonable doubt, it is meant that they must be fully satisfied or entirely convinced or satisfied to a *moral certainty* of the truth of the charge.
>
> If, after considering, comparing and weighing all the evidence, the minds of the jurors are left in such condition that they cannot say they have an abiding faith to a *moral certainty* in the defendant's guilt, then they have a reasonable doubt; otherwise not.
>
> A reasonable doubt, as that term is employed in the administration of criminal law, is *an honest substantial misgiving* generated by the insufficiency of the proof.

*Id.* at 339, 432 S.E.2d at 294-95 (emphasis in original). We found *Cage* error, stating: "We believe the crucial term in the reasonable doubt instruction condemned by the United States Supreme Court in *Cage* is 'moral certainty.' " *Id.* at 342, 432 S.E.2d at 297.

> When a jury is instructed that it may convict if it finds the defendant guilty to a moral certainty it increases the possibility that a jury may convict a person because the jury believes he is morally guilty without regard to the sufficiency of the evidence presented at trial to prove his guilt. Thus, when reasonable doubt is defined in terms of "grave uncertainty," "actual substantial doubt," or in terms which suggest a higher degree of doubt than is required for acquittal under the reasonable doubt standard, and the jury is then told that what is required for conviction is moral certainty of the truth of the charge, the instruction will not pass muster under *Cage*.

*Id.* at 343, 432 S.E.2d at 297.

Here the trial court instructed the jury that "[it] must be fully satisfied, entirely convinced or satisfied to a *moral certainty* of the Defendant's guilt." However, unlike the trial courts in *Cage* and *Bryant*, it did not define reasonable doubt in terms of "grave uncertainty," "actual substantial doubt," "honest substantial misgiving," or other terms which suggest a higher degree of doubt than is required for acquittal under the reasonable doubt standard. Rather, it defined reasonable doubt as "not a vain, imaginary or fanciful doubt but . . . a sane, rational doubt," and referred the jury back to the evidentiary standard.

Thus, the question is whether use of the term "moral certainty" alone — not in combination with "grave uncertainty," "actual substantial doubt," or terms of similar import — raises a reasonable likelihood that the jury applied the instruction to allow a finding of guilt based on a degree of proof below that required by the Due Process Clause. We hold that it does not. Absent those terms, the *possibility* raised by use of the term "moral certainty" remains only a possibility, and does not ripen into a *reasonable likelihood. See id.* at 343, 432 S.E.2d at 297; *see also Boyde,* 494 U.S. at 380, 108 L. Ed. 2d at 329. Therefore, we decline to find *Cage* error.

[2] Within this same assignment of error, defendant contends that the trial court erred in refusing to add to the definition of reasonable doubt the following language, taken almost verbatim from *State v. Riera,* 276 N.C. 361, 367, 172 S.E.2d 535, 539 (1970): "In a criminal case the jury is at full liberty to acquit the defendant if it is not satisfied from all the evidence that the defendant's guilt has been proven beyond a reasonable doubt." Neither statutory nor case law, however, requires that the trial court give the requested instructions verbatim; it is sufficient if it gives them in substance, but only insofar as they are a correct statement of the law and are supported by the evidence. *E.g., State v. Avery,* 315 N.C. 1, 33, 337 S.E.2d 786, 804 (1985). While the language was appropriate, we agree with the trial court that the instructions given made it "overly clear" that the jury could acquit defendant if it found that the State failed to prove its case beyond a reasonable doubt. This assignment of error is overruled.

[3] Defendant contends that the trial court similarly erred in failing to give requested instructions on accident. Defendant submitted in writing the following requested instructions, adapted almost ver-

STATE v. PATTERSON

[335 N.C. 437 (1994)]

batim from *State v. Phillips*, 264 N.C. 508, 512-13, 142 S.E.2d 237, 339-40 (1965):

A defendant's assertion that a killing with a deadly weapon was accidental is in no sense an affirmative defense shifting the burden of proof to him to exculpate himself from a charge of murder. On the contrary, it is merely a denial that the defendant has committed the crime, and the burden remains on the State to prove an intentional killing, an essential element of the crime of murder, before any presumption arises against the defendant.

Where the death of a human being is the result of accident or misadventure, in the true meaning of the terms, no criminal responsibility attaches to the act of the slayer. Where it appears that a killing was unintentional, that the perpetrator acted with no wrongful purpose in doing the homicidal act, that it was done while he was engaged in a lawful enterprise, and that it was not the result of negligence, the homicide will be excused on the score of the accident. The negligence referred to in the foregoing rule of law imports wantonness, recklessness or other conduct, amounting to culpable negligence.

The plea of accidental homicide, if indeed it can be properly called a plea, is certainly not an affirmative defense, and therefore does not impose the burden of proof upon the defendant because the State cannot ask for a conviction unless it proves that the killing was done with criminal intent. It is the duty of the State to allege and prove that the killing, though done with a deadly weapon, was intentional or willful. The claim that the killing was accidental goes to the very gist of the charge, and denies all criminal intent, and throws on the prosecution the burden of proving such intent beyond a reasonable doubt.

An intent to inflict a wound which produces a homicide is an essential element of murder. Therefore, to convict a defendant of murder, the State must prove that the defendant intentionally inflicted the wound which caused the death of the deceased.

When it is made to appear that death was caused by a gunshot wound, testimony tending to show that the weapon was fired by some accidental means is competent to rebut

an intentional shooting. No burden rests on the defendant. He merely offers his evidence to refute one of the essential elements of murder in the second degree. If upon consideration of all the testimony, including the statement of the defendant, the jury is not satisfied beyond a reasonable doubt that the defendant intentionally killed deceased, it should return a verdict of not guilty of murder.

Defendant also asked orally that the trial court add, after the instructions on the elements of, respectively, first-degree murder, and the lesser included offenses of second-degree murder and involuntary manslaughter, the following language: the defendant would be excused of, respectively, first-degree murder, second-degree murder, or involuntary manslaughter, if the jury finds the death of Tonya Renee Mitchell was accidental. Further, defendant requested that the trial court repeat the pattern jury instruction on accident after the final mandate on all charges and defenses.

The trial court instead instructed the jury, after the introduction to the three offenses submitted, as follows:

However, if the deceased died by accident or misadventure, that is without wrongful purpose or criminal negligence on the part of the Defendant, the Defendant would not be guilty of any of these crimes. The burden of proving accident is not on the Defendant. His assertion of accident is merely a denial that he has committed any crime. The burden remains on the State to prove the Defendant's guilt beyond a reasonable doubt.

After the instructions on the elements of the three offenses — first-degree murder, second-degree murder, and involuntary manslaughter — the trial court instructed as follows:

However, where evidence is offered that tends to show that the victim's death was accidental and you find that the killing was in fact accidental, the Defendant would not be guilty of any crime even though his acts were responsible for the victim's death. A killing is accidental if it is unintentional, occurs during the course of lawful conduct and does not involve criminal negligence, which I have just defined for you. A killing cannot be premeditated or intentional or criminally negligent if it was the result of an accident. When the Defendant asserts that the victim's death was the result of an accident, he is

in effect denying the existence of those facts which the State must prove beyond a reasonable doubt in order to convict him. Therefore, the burden is on the State to prove those essential facts and in so doing, disprove the Defendant's assertion of accidental death. The State must satisfy you beyond a reasonable doubt that the victim's death was not accidental before you may return a verdict of guilty.

After the final mandate on all charges and defenses, the trial court instructed as follows:

Furthermore, members of the jury, bearing in mind that the burden of proof rests upon the State to establish the guilt of the Defendant beyond a reasonable doubt, I charge that if you find from the evidence that the killing of the deceased was accidental; that is, that the victim's death was brought about by an unknown cause, or that it was from an unusual or unexpected event from a known cause and you also find that the killing of the deceased was unintentional, that at the time of the homicide the Defendant was engaged in the performance of a lawful act without any intention to do harm and that he was not criminally negligent, if you find these to be the facts, remembering that the burden is upon the State, then I charge that the killing of the deceased was a homicide by misadventure and if you so find, it would be your duty to return a verdict of not guilty as to the Defendant.

Considering the instructions given in their entirety, we conclude that the trial court sufficiently, and substantially in accordance with defendant's request, explained the law regarding accident. This assignment of error is overruled.

[4] Defendant next contends that the trial court erred in denying his motion to dismiss because the State's evidence was insufficient to sustain a verdict of first-degree murder. We disagree.

When a defendant moves for dismissal, the trial court is to determine only whether there is substantial evidence of each essential element of the offense charged and of the defendant being the perpetrator of the offense. *State v. Earnhardt*, 307 N.C. 62, 65-66, 296 S.E.2d 649, 651 (1982). Whether evidence presented constitutes substantial evidence is a question of law for the court. *Id.* at 66, 296 S.E.2d at 652. Substantial evidence is "such relevant evidence as a reasonable mind

might accept as adequate to support a conclusion." *State v. Smith*, 300 N.C. 71, 78-79, 265 S.E.2d 164, 169 (1980). The term "substantial evidence" simply means "that the evidence must be existing and real, not just seeming or imaginary." *State v. Powell*, 299 N.C. 95, 99, 261 S.E.2d 114, 117 (1980).

*State v. Vause*, 328 N.C. 231, 236, 400 S.E.2d 57, 61 (1991). The trial court must consider such evidence in the light most favorable to the State, giving the State the benefit of every reasonable inference to be drawn therefrom. *Id.* at 237, 400 S.E.2d at 61. "The test of the sufficiency of the evidence to withstand the defendant's motion to dismiss is the same whether the evidence is direct, circumstantial, or both." *Id.*

In a first-degree murder trial, "the trial court must determine whether the evidence, viewed in the light most favorable to the State, is sufficient to permit a jury to make a reasonable inference and finding that the defendant, after premeditation and deliberation, formed and executed a fixed purpose to kill." *Id.* at 237, 400 S.E.2d at 62.

> "First-degree murder is the unlawful killing of a human being with malice, premeditation and deliberation." *State v. Misenheimer*, 304 N.C. 108, 113, 282 S.E.2d 791, 795 (1981). Premeditation and deliberation generally must be established by circumstantial evidence, because they ordinarily " 'are not susceptible to proof by direct evidence.' " *Id.* (quoting *State v. Love*, 296 N.C. 194, 203, 250 S.E.2d 220, 226-27 (1978) ). "Premeditation" means that the defendant formed the specific intent to kill the victim some period of time, however short, before the actual killing. *Id.* "Deliberation" means that the intent to kill was formed while the defendant was in a cool state of blood and not under the influence of a violent passion suddenly aroused by sufficient provocation. *Id.*

*Id.* at 238, 400 S.E.2d at 62.

At trial, defendant contended that all the evidence tended to show that he killed the victim accidentally. He now contends that all the evidence tends to show that he shot her during a quarrel, in an emotional moment during their ongoing relationship, without "aforethought or calm consideration." Under either theory, defendant appears to contend, there was no substantial evidence

tending to show that the killing was intentional, premeditated or deliberated. We disagree.

Defendant first told officers that the shotgun discharged when he threw it on the bed. He later stated: "I had the gun up in the air . . . [and] I brought the gun down to throw the gun down and the gun went off and shot her." The physical evidence contradicted both versions, however. There was expert evidence that the shotgun had to be partially or fully cocked before it was fired, that the latch had to be manually adjusted before it was fired because the spring mechanism was broken, and that it took three to four pounds of pressure to pull the trigger. Further, the shotgun had been sawed off, eliminating the choking mechanism in the barrel, and the shotgun pellets would spread out once fired. The wound inflicted was a large hole, with no satellite wounds about the head and face, indicating that the shotgun was fired at close range. Investigators found no pellets or pellet marks anywhere else in the room. From this evidence, the jury could reasonably infer that defendant intentionally pointed the shotgun at Tonya Mitchell at close range and intentionally pulled the trigger.

Premeditation and deliberation generally are not subject to proof by direct evidence but must be proved by circumstantial evidence. *E.g., id.* at 238, 400 S.E.2d at 62. Circumstances from which premeditation and deliberation may be inferred include lack of provocation on the part of the deceased, the conduct and statements of the defendant before and after the killing, and ill will or previous difficulty between the parties. *Id.* Defendant's own statement indicated prior difficulties between defendant and the victim and lack of provocation by the victim. On the night of the killing, defendant stated that the victim found him behind the Green Store and that he did not want her to find him there. She called him "you sorry mother f-----" in front of his brothers and left. Defendant followed her in his own vehicle to the residence they shared, approximately one-and-one-half miles away. Upon arriving, defendant removed his 20 gauge shotgun from the rear floor of the vehicle, entered the house with shotgun in hand, and found the victim in the bedroom packing her clothes. Defendant's statement made no mention of a quarrel.

Other evidence tended to show that defendant gave inconsistent versions of the alleged accident to law enforcement officers. Defendant first stated that the shotgun discharged when he threw

it on the bed; later, he stated: "I had the gun up in the air . . . [and] I brought the gun down to throw the gun down and the gun went off and shot her." Both versions were inconsistent with the physical evidence of the nature of the wound and the expert evidence that the shotgun would not fire unless it was cocked and latched and the trigger was pulled. *Cf. State v. Stager,* 329 N.C. 278, 323, 406 S.E.2d 876, 902 (1991) (evidence that defendant gave inconsistent versions of the alleged accident, both of which were inconsistent with the physical evidence, tended to show that defendant intentionally killed her victim with malice after premeditation and deliberation).

Further, after the deceased called defendant a "sorry mother f——" in front of his brothers, defendant followed her, driving more than one-and-one-half miles from the Green Store to their shared residence. Arriving there, he removed his shotgun from the rear of the car and entered the house. From this evidence, the jury, having concluded that defendant intentionally shot the victim, could further conclude that he had thought about it for at least some short period of time beforehand—for example, while driving to his house and removing the shotgun from the rear floor of his car. It also could further conclude that he then executed his intention in a cool state of blood. Thus, this evidence allowed the jury to find that defendant intentionally killed the victim with malice and with premeditation and deliberation. *Cf. State v. Childress,* 321 N.C. 226, 229-30, 362 S.E.2d 263, 265-66 (1987) (evidence that defendant and victim lived together, victim died from gunshot wound in back fired from a distance of approximately two feet, pistol required cocking before it would fire, and trigger required thirteen pound pull to fire, was sufficient for the jury to find the defendant intentionally, with malice and premeditation and deliberation, killed the victim). This assignment of error is overruled.

[5] In his final assignment of error, defendant contends that the trial court erred by failing to suppress a portion of his custodial statement not disclosed by the State in response to his discovery request, in violation of the Due Process Clause and our discovery statutes, N.C.G.S. §§ 15A-903, -907, and -910. Prior to trial, defendant filed a request for voluntary discovery of, *inter alia,* a copy of any recorded or written statement and a transcription of any oral statement by the defendant. The State in response filed a copy of the written statement defendant gave to Whittle after having been advised of his rights, and sometime later, a supplementary

discovery of certain oral statements made by defendant to Hedgepath, noting that defendant had told Hedgepath that he did not mean to shoot the victim and that he threw the gun down on the bed and it went off, hitting her on the left side of the face.

During trial, Hedgepath testified on direct examination that while waiting in a patrol car at the scene, defendant said to family members and neighbors, "I didn't mean to do it." "Later, [at the police station] he advised that he threw the gun down on the bed and it went off." On recross-examination, counsel for defendant elicited from Hedgepath that defendant made that statement during the custodial interview conducted by Whittle:

> Mr. Whittle asked [defendant] to tell him what happened. . . . [H]e told him about slamming the gun on the bed, Mr. Whittle told him but I'm not going to write this report out but one time and the statement out but one time so be honest with the first time . . . and [then] he went ahead with the true story [that he had the gun in his hands and had the gun up in the air and had it with one hand and brought it down to throw the gun down and the gun went off and shot her].

Whittle later testified on direct examination that, after he read defendant his rights and defendant stated that he understood and waived those rights, "[defendant] gave me two statements." Counsel for defendant immediately objected, and outside the presence of the jury complained that the State's discovery responses never indicated that defendant gave *two* statements to Whittle.

On *voir dire*, Whittle testified that defendant first told him he had put the gun on the bed and it went off. Then Whittle continued, "I told Mr. Patterson that I was going to take a written statement and I wanted him to tell me the truth and I was going to have him sign it when we finish." Defendant then made the statement written down by Whittle, signed by defendant, and disclosed. In pertinent part, defendant stated: "I had the shotgun in my hands and I had the gun up in the air and had it with one hand. I brought the gun down to throw the gun down and the gun went off and shot her. I didn't mean to shoot her cause I love her."

Defendant argued that the State never disclosed defendant's first version to Whittle, which "caught us totally off guard and totally by surprise." If counsel had known there were two versions,

he argued, his trial tactics would have been different: he would have conducted *voir dire* of both Hedgepath and Whittle and might have filed a motion to suppress defendant's custodial statement. Finally, counsel moved to suppress "any reference to anything that [defendant] told Mr. Whittle other than what was furnished to us as the statement that the State intended to use."

The trial court ruled that it "was satisfied that the State sufficiently complied with the requirements of the discovery statutes." It stated: "Defendant was certainly alerted as of July 16, or shortly thereafter, that he allegedly had made a statement that he threw the gun down on the bed and it went off hitting the victim on the side of her face and that he did not mean to hit her." The court instructed Whittle, out of the jury's presence, not to designate the first statement a separate statement or version; it instructed the jury not to consider Whittle's earlier testimony that defendant made two statements.

Defendant now contends that the State violated the discovery statutes, that the evidence not disclosed should have been suppressed or excluded, and that failure to suppress the evidence so prejudiced him that we must grant him a new trial. We agree that the State violated the discovery statutes and the trial court erred in failing to find the violation. We find the error harmless, however.

The statute requires the prosecutor "[t]o divulge, in written or recorded form, the substance of any oral statement relevant to the subject matter of the case made by the defendant, regardless of to whom the statement was made." N.C.G.S. § 15A-903(a)(2) (1988). Further, there is a continuing duty to disclose. N.C.G.S. § 15A-907 (1988). "As used in the statute, 'substance' means: 'Essence; the material or essential part of a thing, as distinguished from 'form.' That which is essential." *State v. Bruce,* 315 N.C. 273, 280, 337 S.E.2d 510, 515 (1985) (quoting *Black's Law Dictionary* 1280 (rev. 5th ed. 1979) ). In its initial response to defendant's discovery request, the State omitted the *essence* of the first version proffered by defendant—that he put or threw the gun on the bed and it discharged—and thus failed to disclose the substance of defendant's custodial statement made during the interrogation by Whittle. The State's subsequent discovery response did not "cure" the error because the State therein failed to refer back to its initial omission or otherwise inform defendant that the written record of his custodial

statement, earlier disclosed, was incomplete. We note parenthetically that, unlike the initial response, the supplementary discovery response did not indicate that the State intended to use the evidence at trial. Thus, the trial court erred in failing to find the discovery violation.

After a thorough review of the record, however, we conclude that the error was harmless. Had the trial court found the violation, in its discretion it could have imposed any or all of the statutory sanctions, including the sanction requested by defendant at trial, *viz*, that "any reference to anything that [defendant] told Mr. Whittle other than what was furnished . . . as the statement that the State intended to use" be excluded. *See* N.C.G.S. § 15A-910 (1993) ("If at any time during the course of the proceedings the court determines that a party has failed to comply with this Article or with an order issued pursuant to this Article, the court in addition to exercising its contempt powers *may* (1) Order the party to permit the discovery or inspection, or (2) Grant a continuance or recess, or (3) *Prohibit the party from introducing evidence not disclosed*, or (3a) Declare a mistrial, or (3b) Dismiss the charge, with or without prejudice, or (4) Enter other appropriate orders.") (emphasis added); *State v. Quarg*, 334 N.C. 92, 103, 431 S.E.2d 1, 6 (1993) ("What sanctions, if any, to impose for the State's failure to comply with discovery is in the discretion of the trial court."); *State v. Shaw*, 293 N.C. 616, 625, 239 S.E.2d 439, 444 (1977) ("By its express terms, this statute authorizes, but does not require, the trial court to prohibit the party offering nondisclosed evidence from introducing it."), *overruled on other grounds, State v. Weaver*, 306 N.C. 629, 295 S.E.2d 375 (1982). In that case, our task would have been to determine whether the trial court properly exercised its discretion in the choice of a sanction. Because the court failed to find the violation, however, and consequently failed to exercise its discretion, the ruling is reviewable. *Cf. State v. Brogden*, 334 N.C. 39, 46, 430 S.E.2d 905, 909 (1993) (" 'When the exercise of a discretionary power of the court is refused on the ground that the matter is not one in which the court is permitted to act, the ruling of the court is reviewable.' ") (quoting *State v. Ford*, 297 N.C. 28, 30-31, 252 S.E.2d 717, 718 (1979) ). We must decide whether Whittle's testimony should have been excluded as a matter of law. We conclude it should not have been. "[T]he purpose of discovery under our statutes is to protect the defendant from unfair surprise by the introduction of evidence he cannot anticipate." *State v.*

*Payne*, 327 N.C. 194, 202, 394 S.E.2d 158, 162 (1990), *cert. denied*, 498 U.S. 1092, 112 L. Ed. 2d 1062 (1991). Defendant cannot have been unfairly surprised by Whittle's testimony because he elicited from Hedgepath earlier in the trial the very evidence he now argues should have been excluded.

Defendant also argues that his trial tactics would have been different had his custodial statement been properly disclosed; specifically, he argues, without elaboration, that he might have made a motion to suppress the custodial statement and he would have conducted *voir dire* of both Hedgepath and Whittle. We note first that defendant could have made a motion to suppress the custodial statement during the trial. *See* N.C.G.S. § 15A-975(b) (1988) ("A motion to suppress may be made for the first time during trial when the State has failed to notify the defendant's counsel or, if he has none, the defendant, sooner than 20 working days before trial, of its intention to use the evidence, and the evidence is: (1) Evidence of a statement made by a defendant."). Notwithstanding, we find no indication in the record that after defendant had been fully advised as to his constitutional rights and had freely, understandingly and voluntarily waived them, his custodial statement was not voluntarily and understandingly made. *See, e.g., State v. Rook*, 304 N.C. 201, 216, 283 S.E.2d 732, 742 (1981), *cert. denied*, 455 U.S. 1038, 72 L. Ed. 2d 155 (1982) ("Even where the procedural safeguards required by *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1968), are recited by the officers and defendant signs a waiver stating that he understands his constitutional rights, . . . the ultimate test of the admissibility of a confession still remains whether the statement made . . . was in fact voluntarily and understandingly given."). We find no indication or suggestion of either physical or mental coercion, such as threats, promises, or other inducements offered in exchange for defendant's statement. Thus, there was no basis for a motion to suppress any or all of defendant's custodial statement, which defendant now asserts he might have made had that statement been completely disclosed.

Finally, we note that defendant was given, and fully availed himself of, the opportunity to question both Hedgepath, upon cross-examination, and Whittle, during *voir dire* and cross-examination, about his custodial statement. Further, defendant elicited, upon cross-examination of Whittle, testimony that the two versions he gave to Whittle during the custodial interview were substantially

similar. Defendant was also free to argue to the jury the exculpatory implications of his multiple versions of how the gun came to discharge.

We therefore conclude that the error was harmless beyond a reasonable doubt. This assignment of error is overruled.

For the foregoing reasons, we hold that defendant received a fair trial, free of prejudicial error.

NO ERROR.