STATE OF NORTH CAROLINA
v.
JOHN DAVID BEAVERS.
No. COA08-550
Court of Appeals of North Carolina
Filed May 5, 2009
This case not for publication
Attorney General Roy Cooper, by Special Deputy Attorney General W. Dale Talbert, for the State.
William D. Auman for Defendant.
McGEE, Judge.
A jury found John David Beavers (Defendant) guilty of first-degree murder on 18 September 2007. Defendant was sentenced to a term of life imprisonment without parole.
Defendant testified at trial that his son, Michael Beavers (Michael), was born in 1980 with retinal blastoma. Michael had been treated since birth for various cancers and related health problems. Michael had a cancerous left eye which was removed when he was three months old, and he received follow-up radiation and chemical therapy treatments for the next four years. Michael developed kidney failure in elementary school and subsequently had a peritoneal catheter installed. Michael underwent a kidney transplant in 1994, which failed in 1999. Thereafter, Michael was provided medical care by Dr. Brian Ling (Dr. Ling) and other physicians in Dr. Ling's nephrology practice, Mountain Kidney Associates. This included the regular administration of hemodialysis at the Davita Dialysis Center which was physically connected with the office building in which Dr. Ling practiced. The optic nerve in Michael's right eye ruptured, causing Michael to become legally blind. During his life, Michael was frequently treated at emergency rooms and hospitalized for conditions related to his cancers and associated medical problems. Many of Michael's emergency room visits were to Memorial Mission Hospital in Asheville, North Carolina.
Defendant regularly intervened on Michael's behalf when Defendant thought appropriate medical treatment was not being provided. Defendant was often confrontational with Dr. Ling and others who provided health care to Michael. During Michael's final illness and hospitalization, Defendant frequently directed profane, abusive or loud language toward Dr. Ling and other medical care givers during these encounters.
Michael was taken to the emergency room of Memorial Mission Hospital on 11 February 2006 for a staph infection of the heart valve. Michael was transferred to Asheville Specialty Hospital, a "step down" unit, on 22 February 2006. When Defendant visited Michael on 25 February 2006, Michael's condition was seemingly improved. A nurse informed Defendant on 1 March 2006 that an accident had occurred with Michael's fistula and that Michael was not allowed visitors. Defendant went to Michael's room where Michael told Defendant that "they [had] hurt him." Defendant called Michael the following day and Michael stated he had been given "way too much dope." Defendant called Asheville Specialty Hospital on 3 March 2006, and a nurse told Defendant to come immediately because Michael was experiencing brain hemorrhage and respiratory/cardiac arrest. Defendant spoke with Dr. Aiello who told Defendant Dr. Ling would have to explain what happened to cause Michael's condition. Defendant returned to Asheville Specialty Hospital and agreed to remove Michael's life support. Michael died on or about 3 March 2006.
On 6 March 2006, the Monday following Michael's death, Defendant consulted an attorney about filing a medical malpractice lawsuit against Michael's medical providers. The attorney told Defendant to obtain Michael's medical records for the past year so the records could be reviewed. That same day, Defendant requested Michael's medical records from Memorial Mission Hospital. Defendant also went to Dr. Ling's office and obtained a business card showing the last names of the doctors in Dr. Ling's practice. Defendant intended to provide Michael's medical records and the list of physicians practicing at Mountain Kidney Associates to the attorney.
Melissa Makovec, who was employed in the records department at Memorial Mission Hospital, testified at trial that Defendant had difficulty obtaining Michael's medical records and that he was tearful and upset when she saw him on 6 March 2006. Defendant called both Memorial Mission Hospital and Mountain Kidney associates on numerous occasions in an effort to learn more about Michael's death, but Defendant was told he would have to make an appointment to see Dr. Ling. Defendant made an appointment to meet with Dr. Ling on 10 March 2006 at 9:00 a.m.
On the evening before his meeting with Dr. Ling, Defendant decided to take a .38 caliber handgun he owned with him "in preparation the next morning." Defendant testified that he had purchased bullets prior to his meeting with Dr. Ling because he was contemplating suicide at that time. Defendant testified that he did these things because:
at one point I was thinking about killing myself, and the more I thought about it I came to the conclusion that I wanted answers to what had happened to my son, and I decided that I would take the gun to the meeting with Dr. Ling, and if I could not be given and shown a reasonable, believable, truthful answer, shown through records and explanations, that maybe neither one of us would leave that office.
Defendant also brought the medical records he had obtained from Memorial Mission Hospital that were related to Michael's last hospitalization to his meeting with Dr. Ling for Dr. Ling to explain. Defendant put a handwritten note on the remainder of the records that read "Replace this one" and left the records in his home. Defendant testified at trial that his note was intended to indicate to his step-daughter that she was to replace the portion of the medical records he was taking to his meeting with Dr. Ling "in the event that the unfortunate event that happened did happen when [Defendant] went to the doctor's office."
Defendant testified that he had been an abuser of crack cocaine and alcohol since 2004 and that the abuse of both substances increased in frequency in the days following Michael's death. On 9 March 2006, the night before his scheduled meeting with Dr. Ling, Defendant stayed up and smoked crack cocaine and drank beer. Before leaving his home on 10 March 2006, Defendant loaded his handgun with five of the bullets he had purchased the night before, took five extra bullets from the box, and put both the gun and the bullets into his jacket pocket.
Defendant then went to a neighbor's house to obtain a car to travel to Dr. Ling's office. Defendant had agreed to purchase the car from the neighbor and had been driving the car regularly. Before leaving in the car, Defendant placed a note on the neighbor's other vehicle with the writing "LL4," which indicated where he intended to park the car. Defendant testified that he left the note for the neighbor "because I had not paid [the neighbor] for [the] car and I was going to park [the] car in the parking deck at Memorial Mission [Hospital], and if anything did happen that prevented me from fulfilling my obligation [to purchase the car], that his vehicle would not be lost at my expense."
Defendant then drove to Memorial Mission Hospital, which was located a short distance from Dr. Ling's practice, and parked in the parking deck. Before walking to Dr. Ling's office, Defendant smoked more crack cocaine in the car. Defendant arrived at Dr. Ling's office a few minutes before his scheduled appointment at 9:00 a.m., and was escorted to an examination room to wait for Dr. Ling. Dr. Ling entered the examination room shortly thereafter. During the course of the meeting, Defendant was adamant in wanting answers from Dr. Ling and was under the impression Dr. Ling was not concerned and did not want to explain the treatment Michael had received. Defendant interrogated Dr. Ling about his concerns but was not satisfied with Dr. Ling's answers and became increasingly angry. During the meeting, Defendant testified he handed the records he had brought with him to Dr. Ling. Dr. Ling informed Defendant that the records were not his and tossed them on the examination table. Approximately twenty minutes into the meeting, after Dr. Ling had responded to a question by saying it was Michael's "time to go," Defendant pulled out his gun and shot Dr. Ling three times. One of the shots struck Dr. Ling in the top of the head and entered the brain, causing fatal injuries.

I.
In Defendant's first assignment of error, Defendant argues the trial court erred by denying Defendant's motion to continue. We disagree.
A motion for continuance is ordinarily addressed to the sound discretion of the trial court, which cannot be disturbed absent a showing of abuse of discretion. State v. Winston, 47 N.C. App. 363, 365, 267 S.E.2d 43, 44 (1980). "When a motion to continue raises a constitutional issue, . . . the trial court's ruling thereon involves a question of law that is fully reviewable on appeal by examination of the particular circumstances presented in the record." State v. Blakeney, 352 N.C. 287, 301-02, 531 S.E.2d 799, 811 (2000). "Even when the motion raises a constitutional issue, denial of the motion is grounds for a new trial only upon a showing that `the denial was erroneous and the defendant was prejudiced as a result of the error.'" Id. (quoting State v. Branch, 306 N.C. 101, 104, 291 S.E.2d 653, 656 (1982)).
In the present case, Defendant requested a continuance due to the fact his counsel's primary para legal, who was familiar with the discovery and medical records, would be unavailable for trial because she had left the country to attend to her seriously ill father. Counsel's other para legal and office assistant had also quit without notice the week before, and would not be available to assist at trial. Defendant argues the trial court, in denying his motion to continue, deprived Defendant of his constitutional right to effective assistance of counsel and deprived Defendant of due process.
Even assuming arguendo that the denial of his motion to continue constituted ineffective assistance of counsel, Defendant has not shown any evidence that the lack of assistance by his trial counsel's staff prejudiced Defendant's case. "`To establish a constitutional violation, a defendant must show that he did not have ample time to confer with counsel and to investigate, prepare and present his defense.'" State v. Williams, 355 N.C. 501, 540, 565 S.E.2d 609, 632 (2002), (quoting State v. Tunstall, 334 N.C. 320, 329, 432 S.E.2d 331, 337 (1993)). "`To demonstrate that the time allowed was inadequate, the defendant must show how his case would have been better prepared had the continuance been granted or that he was materially prejudiced by the denial of his motion.'" Id. at 540-41, 565 S.E. 2d at 632 (quoting Tunstall at 329, 432 S.E.2d at 337). Defendant presents no specific deficiencies in his trial counsel's performance that were allegedly caused as a result of the trial court's denial of his motion to continue. The record also does not show that Defendant's counsel was unable to effectively utilize the medical records provided during discovery in cross-examination of the State's witnesses and during Defendant's direct testimony. Defendant's first assignment of error is overruled.

II.
In his second assignment of error, Defendant argues the trial court erred by allowing the admission of photographic evidence from Dr. Ling's office, because the probative value of this evidence was outweighed by unfair prejudice to Defendant. We disagree.
The decision of whether to admit photographs as illustrative evidence under N.C. Gen. Stat. § 8C-1, Rule 403 is within the sound discretion of the trial court. See State v. Kyle, 333 N.C. 687, 703, 430 S.E.2d 412, 421 (1993) (holding trial court's admission of photographs is reviewed under abuse of discretion standard). "[T]he trial court's ruling should not be overturned on appeal unless the ruling was `manifestly unsupported by reason or [was] so arbitrary that it could not have been the result of a reasoned decision.'" State v. Hyde, 352 N.C. 37, 55, 530 S.E.2d 281, 293 (2000) (quoting State v. Hennis, 323 N.C. 279, 285, 372 S.E.2d 523, 527 (1988)).
At trial, the State attempted to introduce into evidence an exhibit containing three photographs of Dr. Ling's office where other staff members took refuge during the shooting. The photographs showed photographs Dr. Ling kept in his office, one of which was of his daughter "in a little angel outfit." Another photograph of Dr. Ling's office introduced by the State showed photographs in the background of Dr. Ling with his daughter. Another photograph of Dr. Ling's office showed a photograph of his daughter wearing a tiara. Defendant objected to the introduction of these photographs on the ground that "the prejudicial value outweighs the probative value." The trial court initially sustained Defendant's objection.
Later in the trial, however, Dr. Brian England (Dr. England) identified an exhibit introduced by Defendant as being a photograph of two pairs of eyeglasses at the crime scene, one of which Dr. England assumed belonged to Dr. Ling. The State again presented the three-photo array that had previously been excluded by the trial court. The State asked Dr. England if the photographs illustrated his testimony that Dr. Ling wore eyeglasses. When Dr. England responded that they did, the State moved for the admission of the exhibit for illustrative purposes. Defendant objected, but the trial court overruled this objection and admitted the exhibit for "illustration purposes only."
Defendant argues the trial court's admission of the photographs of Dr. Ling's office as illustrative evidence that Dr. Ling wore eyeglasses resulted in unfair prejudice since these photographs also contained photographs of Dr. Ling's daughter in the background. "Unfair prejudice," as used in Rule 403 of the N.C. Rules of Evidence, states that evidence, even if deemed relevant, may be excluded if the probative value is substantially outweighed by the danger of unfair prejudice. N.C. Gen. Stat. § 8C-1-403 (2007). In Hennis, our Supreme Court set forth factors which the trial court must examine in order to determine whether, under the totality of circumstances, the presentation of photos is more prejudicial than probative. These factors include: what is depicted, the level of detail, how it is presented, and the relevance of the scene depicted, among other considerations. Hennis, 323 N.C. at 285, 372 S.E. 2d at 527. "Only upon a showing that the trial court erred and that defendant has been prejudiced thereby will defendant be granted a new trial." Id. at 287, 372 S.E.2d at 528.
In State v. Johnson, 298 N.C. 355, 259 S.E.2d 752 (1979), and State v. Temple, 302 N.C. 1, 273 S.E. 2d 273 (1981), "the unnecessary or repetitive use of photographic evidence was held to be harmless where the evidence of defendant's guilt was overwhelming." Hennis, 323 N.C. at 287, 372 S.E.2d at 528. In Johnson, our Supreme Court held the admission of photographs of the victim's body as it appeared two months after his death, was prejudicial error in the sentencing phase of the trial. Johnson, 298 N.C. at 376, 259 S.E.2d at 765. In Johnson, the defendant was convicted of first-degree murder and sentenced to death after he testified that he had strangled and killed a ten-year-old boy after the boy had refused to have sex with him for ten dollars. Id. at 358-60, 259 S.E.2d at 755-56. However, in light of the overwhelming evidence of guilt, admission of the photographs was harmless error in the guilt determination of the trial. Id. at 376-77, 259 S.E.2d at 765-66.
In Temple, the defendant was convicted of first-degree murder after confessing to police that he repeatedly hit the victim with a heavy blunt object. Temple, 302 N.C. at 2-3, 273 S.E.2d at 274-75. On appeal, the defendant argued that photographs shown to the jury of the victim's exhumed body as illustrative evidence were unfairly prejudicial and without probative value. Id. at 13, 273 S.E. 2d at 281. The Court held that several of the photographs added nothing to the State's case and would have been better left unpresented. Id. at 14, 273 S.E.2d at 281. Nevertheless, in view of the overwhelming evidence of the defendant's guilt, the Court held the photographs were harmless error beyond a reasonable doubt and overruled the defendant's assignment of error. Id.
In the present case, the State presented photographs of Dr. Ling's office to illustrate that the eyeglasses shown in the crime scene photo belonged to the victim. These photographs also showed in the background photographs of Dr. Ling's daughter, which Defendant argues constituted a "`back door' means to appeal to the sympathy of the jury[.]" Even assuming arguendo it was error to admit these photographs, given the overwhelming evidence against Defendant, we cannot hold that these photographs were unduly prejudicial.
Prior to the admission of the contested photographs, the State presented evidence that Dr. Ling had a daughter, which was admitted without objection. Thus, any additional sympathy invoked by the photographs, was minimal. Furthermore, Defendant testified that he shot and killed Dr. Ling with a .38 caliber handgun while meeting with Dr. Ling in one of the examination rooms at Mountain Kidney Associates. Although we find the State's use of these photographs for the illustrative purpose of showing that the victim wore eyeglasses added nothing to the State's case, we find it to be harmless error because the evidence of Defendant's guilt was overwhelming. Therefore, Defendant's assignment of error is overruled.

III.
In Defendant's third assignment of error, Defendant argues the trial court erred by denying his motion for a mistrial based on the prejudicial effect of the photographs admitted for illustrative purposes in the previous argument. We disagree.
The decision of whether to grant or deny a motion for mistrial rests in the sound discretion of the trial court and will not be disturbed on appeal absent a showing of an abuse of discretion. State v. Upchurch, 332 N.C. 439, 453, 421 S.E.2d 577, 585 (1992). A trial court's decision may be reversed for an abuse of discretion only upon a showing that its ruling was so arbitrary that it could not have been the result of a reasoned decision. Id.
Since we have held the trial court committed no prejudicial error in admitting the photographs, we also reject Defendant's argument that the trial court erred in denying Defendant's motion for a mistrial based on the admission of the photographs. Defendant's assignment of error is overruled.

IV.
Defendant's next assignment of error alleges the trial court erred by allowing the State to use dialysis treatment records in cross-examining Defendant on grounds the records were untimely provided under N.C. Gen. Stat. §15A-903. We disagree.
A trial court's decision to admit evidence in spite of a discovery objection is reviewed for an abuse of discretion, and a trial court's ruling will only be reversed "`upon a showing that its ruling was so arbitrary that it could not have been the result of a reasoned decision.'" State v. Herrera, __ N.C. App. __, __, 672 S.E.2d 71, 82 (2009) (quoting State v. Carson, 320 N.C. 328, 336, 357 S.E.2d 662, 667 (1987)).
Defendant argues that prior to his testimony, the State gave defense counsel "a huge stack" of the Davita Dialysis Center records that the State intended to use for cross-examination. These records were obtained pursuant to an order of the trial court the previous day. Defendant argues the records were not timely provided and, therefore, neither he nor defense experts had time to review them.
N.C. Gen. Stat. § 15A-903(a)(1) (2007) provides that upon motion of a defendant, the trial court must order the State to:
Make available to the defendant the complete files of all law enforcement and prosecutorial agencies involved in the investigation of the crimes committed or the prosecution of the defendant. The term "file" includes the defendant's statements, the codefendants' statements, witness statements, investigating officers' notes, results of tests and examinations, or any other matter or evidence obtained during the investigation of the offenses alleged to have been committed by the defendant. The term "prosecutorial agency" includes any public or private entity that obtains information on behalf of a law enforcement agency or prosecutor in connection with the investigation of the crimes committed or the prosecution of the defendant.
In State v. Cook, 362 N.C. 285, 661 S.E.2d 874 (2008), our Supreme Court held the State violated N.C. Gen. Stat. § 15A-903(a)(2) by failing to provide the defendant with the disclosure of an expert's name, curriculum vitae, and written report "within a reasonable time before trial" as required by the statute. Cook at 292, 661 S.E.2d at 878. In Cook, the State's violation was based upon the fact that the State's expert had completed his report five weeks before the trial was to begin, and the State failed to provide notice that it planned to call the expert as a witness until five days before trial. Id. at 292, 661 S.E.2d at 879. The Court held the error was harmless because the State had provided "abundant other admissible evidence." Id. at 296, 661 S.E.2d at 881.
In the present case, the State requested the trial court to enter an order requiring Davita Dialysis Center to provide the State with Michael's full medical records. The trial court issued its order on 12 September 2007, two days after the trial had begun. The record shows the State received the medical records sometime during that day and delivered them to Defendant's counsel shortly after receiving them. There is no evidence the State was aware the Davita Dialysis Center records existed prior to trial. "`The purpose of discovery under our statutes is to protect the defendant from unfair surprise by the introduction of evidence he cannot anticipate.'" State v. Murillo, 349 N.C. 573, 585, 509 S.E.2d 752, 759 (1998) (quoting State v. Patterson, 335 N.C. 437, 455, 439 S.E.2d 578, 589 (1994)). Defendant had the effective ability to "anticipate" the introduction of Michael's medical records into evidence. Even had the State been aware of the Davita Dialysis Center records, the State did not physically obtain the records until the trial court's order of 12 September 2007, after which Defendant had access to them within a reasonable time.
Defendant also argues under this assignment of error that his constitutional rights to due process and confrontation were violated, as the accused should have reasonable time to investigate, prepare and present his defense in respect to the Davita Dialysis records. We disagree.
Defendant's rights to discovery are statutory, not constitutional. "There is no general constitutional or common law right to discovery in criminal cases." State v. Haselden, 357 N.C. 1, 12, 577 S.E.2d 594, 602 (2003). "However, the State is required to disclose `evidence [that] is material either to guilt or to punishment.'" Id. at 13, 577 S.E.2d at 602 (quoting Brady v. Maryland, 373 U.S. 83, 87, 1196-97, 10 L. Ed. 2d 215, 218 (1963)). Assuming the records in question contained evidence material to guilt or punishment, due process is satisfied by the disclosure of the evidence at trial, so long as the disclosure is made in time for the defendant to make effective use of the evidence. See Haselden, 357 N.C. at 13, 577 S.E.2d at 602.
The record reveals the State used records from the Davita Dialysis Center in cross-examining Defendant, and these records were provided to Defendant's counsel a day and a half before the records were used. These records were used by the State to prove Dr. Ling and other staff had provided basic medical care to Michael. Based on these facts, we believe there was no deprivation of Defendant's due process rights. Thus, we find no abuse of discretion in the trial court's decision to admit the Davita Dialysis Center records. This assignment of error is overruled.

V.
In Defendant's fifth assignment of error, Defendant argues the trial court erred in instructing the jury on the State's burden of proof. We find no error.
Where a defendant objects to a jury instruction, the standard of review is well established:
This court reviews jury instructions "contextually and in its entirety. The charge will be held to be sufficient if it presents the law of the case in such a manner as to leave no reasonable cause to believe the jury was misled or misinformed . . . . Under such a standard of review, it is not enough for the appealing party to show that error occurred in the jury instructions; rather, it must be demonstrated that such error was likely, in light of the entire charge, to mislead the jury."
State v. Blizzard, 169 N.C. App. 285, 296-97, 610 S.E.2d 245, 253 (2005) (quoting Bass v. Johnson, 149 N.C. App. 152, 160, 560 S.E.2d 841, 847 (2002)). Defendant contends the trial court erred by giving an instruction to the jury that gave "mixed signals" in regard to whether defense counsel had the burden to prove Defendant had diminished capacity to form the specific intent for first-degree murder. The record shows the trial court instructed the jury on the State's burden of proof and reasonable doubt. Defendant specifically argues the following instructions were given in error:
Your duty is to consider three things, essentially, and three things only: The evidence that came to you from the mouths of witnesses from this witness stand after they took some kind of oath. That is, so much of that evidence as you deem to be believable to the extent of beyond a reasonable doubt in accordance with what the state must prove, the defendant having no burden to prove anything, any reasonable inferences that arise from that same evidence that you deem to be believable to the extent of beyond a reasonable doubt in accordance with what the State must prove, the defendant having no burden to prove anything, and any exhibits relevant to, germane to, pertinent to that same evidence you deem to be believable to the extent of beyond a reasonable doubt in accordance with what the State must prove, again, the defendant having no burden to prove anything.
Defendant argues the instructions, in stating several times that "[D]efendant had no burden to prove anything" impermissibly shifted the burden to establish Defendant was suffering from a mental or emotional condition which prohibited him from forming the specific intent for first-degree murder.
Defendant cites State v. Mash, 323 N.C. 339, 372 S.E.2d 532 (1988) in support of his argument. In Mash, the defendant requested the pattern jury instruction regarding a jury's consideration of evidence pertaining to the defendant's voluntary intoxication. Id. at 344, 372 S.E.2d at 535. The trial court relied in large part on the defendant's requested instruction, but also included language from the State's request which placed a substantially heavier burden on the defendant than the law required him to bear[1]. Id. at 345, 372 S.E.2d at 536.
Here, unlike in Mash, the trial court instructed the jury on first-degree murder with a firearm and second-degree murder, using the North Carolina Pattern Jury Instructions for Criminal Cases. Defendant did not request an instruction on diminished capacity, and none was given. Evidence in the record shows the jury asked the trial court to repeat its instructions twice after the initial instruction. We hold the trial court correctly instructed the jury each of the three times on the elements of first-degree and second-degree murder, leaving no reasonable cause to believe the jury was misled or misinformed. This assignment of error is overruled.

VI.
In Defendant's final assignment of error, he argues the trial court erred in failing to dismiss the charge of first-degree murder against Defendant for insufficient evidence. We disagree. In reviewing a motion to dismiss challenging the sufficiency of evidence, this Court must view the evidence in the light most favorable to the State, giving the State the benefit of any reasonable inferences to be drawn. State v. Benson, 331 N.C. 537, 544, 417 S.E.2d 756, 761 (1992). Our Court considers whether the State presented "substantial evidence" in support of each element of the charged offense and of the defendant's identity as the perpetrator of the offense. State v. Lowery, 309 N.C. 763, 766, 309 S.E.2d 232, 235-36 (1983). "Substantial evidence is that evidence which a reasonable mind might accept as adequate to support a conclusion." State v. Chapman, 359 N.C. 328, 374, 611 S.E.2d 794, 827 (2005). Such evidence may be direct, circumstantial, or both. Id.
First-degree murder is the unlawful killing of another with malice and with premeditation and deliberation. State v. Lawson, __ N.C. App. __, __, 669 S.E.2d 768, 776 (2008). "Premeditation means that the act was thought out beforehand for some length of time, however short, but no particular amount of time is necessary for the mental process of premeditation." State v. Conner, 335 N.C. 618, 635, 440 S.E.2d 826, 835-36 (1994). "Deliberation means an intent to kill, carried out in a cool state of blood, in furtherance of a fixed design for revenge or to accomplish an unlawful purpose and not under the influence of a violent passion, suddenly aroused by lawful or just cause or legal provocation." Id. at 635, 440 S.E.2d at 836.
In the present case, Defendant bought bullets for his handgun the night before he met with Dr. Ling, and then brought the gun with him to his meeting with Dr. Ling. Defendant also admitted at trial that he took the gun to the meeting with a conditional expectation of killing Dr. Ling if he did not get a reasonable explanation about why Michael died. Defendant left notes for his step-daughter and neighbor under the belief he might not return from the meeting. Defendant also admitted to his psychologist that the decision to kill Dr. Ling was made when the doctor answered a question by saying: "It was [Michael's] time to go."
Viewed in the light most favorable to the State, this evidence was sufficient to submit the charge of first-degree murder to the jury. There was substantial evidence presented at trial that Defendant acted with premeditation and deliberation. This assignment of error is overruled.
No error.
Judges JACKSON and HUNTER, JR. concur.
Report per Rule 30(e).
NOTES
[1] The portion of the jury instructions in Mash which were in error were as follows: "However, the intoxication must be so great that his mind and reason were so completely overthrown so as to render him utterly incapable to form a deliberate and [premeditated] purpose to kill. Mere intoxication cannot serve as an excuse for the defendant. It must be intoxication to the extent that the defendant's mental processes were so overcome by the excessive use of liquor or other intoxicants that he had temporarily, at least, lost the capacity to think and plan." Mash, 323 N.C. at 345, 372 S.E.2d at 536 (emphasis removed).