STATE v. NIXON

[117 N.C. App. 141 (1994)]

STATE OF NORTH CAROLINA v. GARY EDWARD NIXON

No. 945SC144

(Filed 6 December 1994)

**1. Homicide § 635 (NCI4th)— no duty to retreat—failure to instruct error**

In a first-degree murder case where the evidence tended to show that defendant and the victim were shooting at each other from separate cars after the victim was the aggressor in the events preceding the first shooting, the trial court erred in failing to instruct that defendant had no duty to retreat, since the evidence showed that, because the victim was using deadly force, defendant was permitted to stand his ground and kill the victim if defendant believed it necessary and had a reasonable ground for such belief.

**Am Jur 2d, Homicide § 520.**

**Homicide: Extent of premises which may be defended without retreat under right of self-defense. 52 ALR2d 1458.**

**Homicide: Modern status of rules as to burden and quantum of proof to show self-defense. 43 ALR3d 221.**

**Standard for determination of reasonableness of criminal defendant's belief, for purposes of self-defense claim, that physical force is necessary—modern cases. 73 ALR4th 993.**

**2. Evidence and Witnesses § 876 (NCI4th)— statement of murder victim—admissibility to show state of mind**

The trial court in a murder prosecution did not err in admitting testimony of the victim's brother concerning a question asked of defendant by the victim at the beginning of their altercation as to why defendant had recently pulled a gun on him, since this hearsay statement was properly admitted pursuant to N.C.G.S. § 8C-1, Rule 803(3), which deals with a statement of the declarant's then existing state of mind, emotion, sensation, or physical condition.

**Am Jur 2d, Evidence § 866.**

**Exception to hearsay rule, under Rule 803(3) of Federal Rules of Evidence, with respect to statement of declar-**

ant's mental, emotional, or physical condition. 75 ALR Fed. 170.

**3. Evidence and Witnesses § 1070 (NCI4th)— instruction on flight—sufficiency of evidence**

The trial court in a murder prosecution properly instructed on flight of defendant where the evidence showed that after the shootings, defendant, who testified that he saw one victim's body fall out of the other victim's car and that he believed he had shot the second victim, jumped into his car and left, thereafter picked up his friend, and disposed of his gun before he called an acquaintance who was a police officer.

**Am Jur 2d, Trial § 1184.**

Appeal by defendant from judgment entered 19 February 1993 by Judge Henry L. Stevens, III in New Hanover County Superior Court. Heard in the Court of Appeals 25 October 1994.

*Attorney General Michael F. Easley, by Assistant Attorney General Valerie B. Spalding, for the State.*

*Nora Henry Hargrove for defendant-appellant.*

JOHNSON, Judge.

Defendant Gary Edward Nixon was indicted for the first degree murders of Debra Henry and O'Hara Sneed. Upon defendant's pleas of not guilty, defendant was tried during the 1 February 1993 session of New Hanover County Superior Court.

Evidence presented at trial by the State showed the following: Joe Sneed, brother of one of the victims, O'Hara Sneed, testified that on 21 June 1992 he and O'Hara Sneed went to visit their father in O'Hara Sneed's brown Malibu vehicle and that three friends were with them; that while at their father's house, O'Hara Sneed checked out his shotgun by firing it into the air; that about 1:00 p.m. they drove back to Wilmington to a store on 10th and Dawson Streets to get something to drink; and that in the vehicle, O'Hara Sneed was driving, Debra Henry was in the front passenger seat, Michael Brown was behind her, Joe Sneed was in the middle, and Deidra Davis was behind O'Hara Sneed.

Joe Sneed further testified that when they arrived at the store, he saw defendant standing with a companion named Millhouse, near a

gray Cadillac facing Dawson Street; that O'Hara Sneed jumped out of his vehicle, got his shotgun out of the trunk and ran over to defendant; that (over the State's objection) O'Hara Sneed asked defendant why he had recently pulled a gun on him and threatened him; that O'Hara Sneed then fired his shotgun up into the air and returned to his car; that he did not know what O'Hara Sneed did with his shotgun; and that defendant jumped into his Cadillac and drove off up Dawson Street. Sneed's testimony continued, that defendant's companion went into the store; that O'Hara Sneed, Joe Sneed and the others drove to another store on 9th Street and Castle Street where O'Hara Sneed went inside and bought a fifth of wine; that after O'Hara Sneed had returned to the car and started it, O'Hara Sneed remarked to the others that defendant was coming; that he saw defendant driving towards them at a high rate of speed on Castle Street; that O'Hara Sneed began to drive similarly fast toward defendant's car; that as the cars approached each other, defendant reached out of his Cadillac and began to shoot into O'Hara Sneed's car; that he saw Debra Henry reach over for the front seat door knob with her left hand; that Debra Sneed was hit by gunfire and fell out of O'Hara Sneed's car; that O'Hara Sneed stopped the car and told the others to get out and see to her and then O'Hara Sneed drove on; that he saw that Debra Henry was dead and he told his companions to take cover behind a nearby church since bullets were still flying; that after the gunfire stopped, he emerged from cover and ran to Debra Henry's body; that he saw that O'Hara Sneed's car had backed into the church wall; and that he ran to it and found O'Hara Sneed slumped over with his head in the passenger seat, unconscious. He testified that an ambulance arrived a short time later, and that when he looked at O'Hara Sneed's Malibu, he saw that the hood and the driver's door had holes in them which had not been there earlier. On cross-examination, Mr. Sneed testified that he did not know if O'Hara Sneed had anything to drink that day; that he "guess[ed]" when O'Hara Sneed returned to the Malibu after the confrontation with defendant that the shotgun was in the front seat; and that when defendant was coming at them in the Cadillac, that O'Hara Sneed did not try to turn off or duck or pull over to the curb.

Deidra Davis, Debra Henry's sister, testified and corroborated Joe Sneed's testimony. She testified additionally that when defendant approached O'Hara Sneed's car on Castle Street, O'Hara Sneed told them all to "duck"; that when O'Hara Sneed told the three of them in the back to get out and see to Debra Henry, she ran towards her sis-

ter's body, but the shooting was still going on and so she ran with the others behind the church; and that she did not see O'Hara Sneed with a shotgun while the car was on Castle Street and that she did not see him fire a shotgun. On cross-examination, Deidra Davis testified that nobody had been drinking on 21 June 1992, and that she did not smell the odor of alcohol on anyone in O'Hara Sneed's car; that when O'Hara Sneed returned to the Malibu after the confrontation with defendant, he did not hand the shotgun to anyone, he kept it himself; and that two days after the shootings, she recalled telling an officer that O'Hara Sneed and defendant were shooting at each other and that during the shooting, she assumed her sister had run from the car.

Michael Brown also corroborated the testimony of Joe Sneed and Deidra Davis. Mr. Brown added that when O'Hara Sneed saw defendant driving toward them at a high rate of speed, O'Hara Sneed told the others that defendant had a gun; that after O'Hara Sneed stopped to let the others out, O'Hara Sneed turned the car around and started back toward the other end of Castle Street; and that he did not hear a shotgun fired from the car in which he was riding. On cross-examination, he stated that although, shortly after the shooting, he had told an officer that after Debra Henry fell out of the car, O'Hara Sneed went back to the trunk and fired two rounds back at defendant, he was excited at the time he made the statement to the officer, and in fact did not hear a shotgun blast. Michael Brown has been convicted of forgeries, breaking and enterings, and larcenies.

Angela Moore testified that on 21 June 1992, she, her husband and two children were driving on Castle Street; that they stopped at a stop sign at the corner of 11th Street and she saw a brown Malibu coming from the left and a Cadillac approaching from the other direction; that as the Cadillac approached the Malibu, the Cadillac crossed the center line and the Malibu began to swerve; that she saw a person fall out of the Malibu; that they then went to call the police; and that when they returned, the body was in the road and the Malibu had reversed into the church wall.

Susan Torres testified that she, her husband and daughter were driving on Castle Street on 21 June 1992; that after they had gone through the intersection of 9th Street and Castle Street, they heard what sounded like a "pop"; that the brown car in front of them began to swerve and the people's heads inside were bobbing around; that the car slowed and a woman's body fell out of the passenger side; that the car continued down Castle Street, slowed down, and three people

got out and fled; that the vehicle continued for a short distance, then made a U-turn and came back very fast; that she and her husband looked for a phone and stopped at a house; that as they approached the house, she heard several more "popping" noises; and that she and her husband returned to their car and left the area. Her husband, Jose Torres, corroborated her testimony, and stated that he did not hear any shotgun blasts at any time. Robert Milner testified that while in his home at 1105 Castle Street around 1:30 p.m. the day of the shooting, he heard "popping" sounds that sounded like shots; that he then walked to the front door and Susan Torres was approaching his house when he heard more shots fired; and that the sounds were rifle shots, not shotgun blasts.

Officer Edward Gibson testified that he answered a call to the crime scene on Castle Street; that he observed the brown Malibu backed into the church wall and Debra Henry's body lying in the street; that the car was still in reverse, the motor was running and the tires were spinning; that O'Hara Sneed was lying on the front seat; that a shotgun and three dollar bills were lying in the road; that there was no weapon in the Malibu, nor shells; and that the car interior did not smell as if a shotgun had been fired from within the vehicle. On cross-examination, Officer Gibson stated he was not familiar with how long the odor of a shotgun would last in a car.

Officer David Smith testified he was nearby when he received the call to Castle Street; that he heard a series of shots but not a shotgun blast; that when he arrived on the scene, he saw the brown Malibu "wrecked" over a sidewalk into the brick wall and an unloaded shotgun of which he took custody lying in the road across the double yellow line; that there were no shotgun shells lying in the road; and that the shotgun was a sawed-off shotgun and was illegal. Officer Ralph Shingleton also answered the call to the crime scene, and in the roadway he discovered some spent casings and live rounds which he pointed out to the I.D. technician.

Officer R. P. Lockamy, crime scene investigator, testified that she found seven fired .30 carbine casings and two unfired bullets in the area near the corner of 9th Street and Castle Street (the 900 block); that she took a number of photographs looking at the crime scene from the 1000 block of Castle Street; that when she inspected the Malibu, she noticed that the driver's door and the passenger door were open; that there were bullet holes in the windshield, the hood, and behind the left front tire; that there was blood in the passenger

seat and a bloody baseball cap was outside the passenger door; that an unopened wine bottle was on the passenger floorboard; that the car was in reverse and had caused there to be black rubber on the sidewalk; and that both the wall and the car were damaged from the crash.

Fred Parrish testified that he was driving down Castle Street the afternoon of 21 June 1992 when he saw a body lying in the road and a rifle nearby; that he then saw and heard someone firing a rifle with something that appeared to be a scope from an old Cadillac; that as he looked around, he saw the brown Malibu rolling backwards into the church wall; and that he knew what a shotgun blast sounded like but he heard only rifle shots. James Oliver testified that he lived on 9th Street and that he also heard rifle shots; he saw defendant preparing to put the rifle into the Cadillac's trunk and he saw that the rifle had a scope.

Richard Lundy, a cashier at a convenience store on 10th and Castle Streets, testified that he was in the store on 21 June 1992; that someone came in and said a girl had been shot; that he called 911 and then went outside and saw the body lying in the street; that he then saw the brown Malibu "screech" to a halt at the light on Castle Street heading towards 9th Street; that he saw the driver shift the gear up and open the door to step out; that the car began rolling back; and that the driver reached in and brought out a shotgun, placing it between the windshield and the door, and aiming it at the corner across the street. He further testified that he could not see anyone at that spot but that since he was in the line of fire, he returned to the store; that he then looked out the window and saw the brown car backing into the church wall; and that he returned outside once the police arrived and saw the shotgun lying in the road, about where the car had been, on the driver's side, but did not see any shotgun shells. Additional witnesses testified that their Castle Street homes had sustained damage from the rifle shots.

Salam Fattah testified that he was inside his business on Castle Street with his brother when someone came in and said shots were being fired; that he went outside and saw defendant shooting with a rifle towards the 9th Street block; that he also saw defendant pull the rifle back a couple of times so that live bullets fell onto the street; and that after defendant finished firing, he reversed his car back up Castle Street and disappeared. Salam Fattah's brother, Ahmad Fattah, corroborated his brother's testimony.

STATE v. NIXON

[117 N.C. App. 141 (1994)]

Charles Garrett, M.D., was accepted as an expert in the field of pathology. He testified that he performed an autopsy on O'Hara Sneed's body on 22 June 1992; that he found a gunshot wound above O'Hara Sneed's left eye which went straight through the brain, producing a large track of damage; and that although O'Hara Sneed had died from pneumonia of the lungs resulting from unconsciousness by gunshot wound, he was brain dead at the time he was actually shot.

Special Agent Thomas Trochum of the State Bureau of Investigation was accepted as an expert in the field of firearms identification. He testified that he had conducted an analysis upon the spent shell casings and unfired bullets recovered from the crime scene on Castle Street; that in his opinion, all seven of the fired cartridge cases were extracted from the same firearm; that the two unfired bullets did not have sufficient microscopic individuality for Agent Trochum to determine that they had also been worked through the same firearm, but that the bullets were all the same design and from the same manufacturer; and that the fired bullets were all worked through the action of a firearm known as an M-I carbine.

After the State rested, defendant testified on his own behalf. Defendant testified that on the morning of 21 June 1992, he took his guardian's car, a Cadillac, to the car wash; that he had a rifle in the trunk, which he put in the back seat so that nobody at the car wash could see it; that a friend, Jerone Millhouse, called him on the car phone, so defendant went to pick him up; that the two then drove to 10th and Dawson Streets to buy something to drink; that when they came out of the store, O'Hara Sneed "came out of nowhere[,]" pointed a shotgun at defendant, and held him up for his money; that he believed O'Hara Sneed was high on drugs; that O'Hara Sneed then fired the shotgun into the air and bent down to collect defendant's money from the street where defendant had dropped it; and that someone yelled that the police were coming and defendant jumped into the Cadillac and left, pulling out in front of other cars. Defendant further testified that he stopped a couple of blocks away to smoke and to pick up items that had fallen to the floorboard; that he tried to call his guardian and also tried to call a local police officer, Buster Yost, because he was scared; that he then drove up 12th Street until it deadended at Castle Street and turned onto Castle Street going toward the river; that as he got to between 11th and 10th Streets, a car "came out of nowhere" and "seemed like it was coming directly at me"; that "[w]hen it came directly at me I pulled over a little bit" and saw it was O'Hara Sneed; that "[w]hen [O'Hara Sneed] pulled beside

me he had the shotgun in his hand and we was side by side"; that "[a]t
that time I grabbed my gun" from the back seat; and that "I tried to
shoot him because he was trying to shoot me." Defendant further tes-
tified that after he shot,

> Mr. [O'Hara] Sneed pulled to the opposite side of the road. I
> speeded off. I tried to get away. I was going forward. As I was
> going forward I got there to 10th and Castle. In the middle of the
> intersection a yellow cab pulled in front of me and I stopped. I
> slammed on brakes right in the intersection. The cab went. After
> the cab went another car went. I looked back in my mirror. At
> that time the girl had already fell out of the car. Mr. [O'Hara]
> Sneed had made a U-turn. He was coming behind me. . . . I was
> trying to get away from him. I speeded up and I seen him coming
> behind me. I get up—I went—I got up there between 8th Street. It
> was two cars parked, stopped at the red light. The light was red.
> Two car[s] at the light waiting for the light to [change]. Traffic
> was coming down both ways like that. Going across like that. And
> I seen [O'Hara] Sneed coming up, so I turned around. As I turned
> around, as I made a complete turn around [O'Hara] Sneed was
> outside of the car pointing the gun at me. . . . At that time I stuck
> my gun out of the window and shot and I leaned down and I
> shot. . . . At that time, Mr. [O'Hara] Sneed jumped in the car and
> came forward. I backed up. He got back out of the car. As he got
> out the car, he was getting out of the car and the car started
> rolling back. When the car started rolling back he put one foot in
> the car. At that time, you know, I started shooting, because you
> understand he was pointing the gun again. I started shooting and
> I shot maybe three times, two more times, maybe three times and
> I think I hit the car. I am not sure. I think I did hit the car and Mr.
> [O'Hara] Sneed started getting back in the car and after he was
> coming at me again, so I shot. At that time I shot. The bullet, I
> think it hit Mr. [O'Hara] Sneed because the car started rolling
> back. The car rolled back and hit the wall.

After O'Hara Sneed's car hit the church, defendant jumped back into
the Cadillac and left.

Defendant further testified that he picked up his friend and tried
again to call Officer Yost; that they were finally in touch and Officer
Yost told defendant to turn himself in; that defendant met Officer Yost
and told him what had happened; that defendant knew because of a
previous felony conviction, he was not supposed to have a gun; and

that before talking to Officer Yost he had disposed of the gun in a nearby river. He testified that O'Hara Sneed had previously robbed him and had "cut" him but that defendant had not reported this incident.

On cross-examination, defendant stated that his rifle did not have a scope on it, that he did not know how many bullets were in it, that he was not very familiar with it, and that he did not know whether it had a safety. When questioned as to how much money he had thrown on the ground in front of O'Hara Sneed when O'Hara Sneed had held him up on 10th and Dawson Streets, defendant stated that he had told Officer Yost that he had started out with $150.00 the morning of the shooting so that the amount was probably anywhere from $90.00 to $130.00. He also told Officer Yost that O'Hara Sneed had fired at him when they were on Dawson Street and that one of the shotgun pellets had struck him in the leg. Defendant stated he never got out of the Cadillac and that he shot O'Hara Sneed by leaning out and firing while the engine was running, the car was in drive, and defendant's foot was on the brake, because "it happened so quickly[.]" While interrogated about the second shooting, defendant testified that "[a]ll I know is when I turned around and I seen Mr. [O'Hara] Sneed with that gun pointed at me . . . I stopped and I shot back at Mr. [O'Hara] Sneed[.]"

The parties stipulated that O'Hara Sneed's blood alcohol level was .23 at the time of the shooting.

On rebuttal, the State called Officer Yost, who testified that he had made contact with defendant on 21 June 1992 and had interviewed him while driving to the police department; that defendant told him that O'Hara Sneed had pulled a sawed-off shotgun on him and robbed him of approximately $150.00; that defendant told him he had thrown the money on the ground and that as he ran away he heard the shotgun fire and a pellet hit him in the leg; that he asked defendant if he was hurt or injured and defendant said that he did not think so as they both looked at defendant's legs; and that defendant said he had been given the rifle he used to kill O'Hara Sneed. The State then rested its case.

Defendant was found not guilty of the murder of Debra Henry and not guilty of firing into an occupied vehicle. Defendant was found guilty of one count of voluntary manslaughter for the killing of O'Hara Sneed. Defendant has appealed to our Court.

**[1]** Defendant argues on appeal that the trial court erred in failing to instruct that defendant had no duty to retreat before repelling a felonious and deadly assault. During the charge conference, defendant's counsel requested, as to the charge of first degree murder of O'Hara Sneed, that in addition to the self-defense instructions the trial court proposed to give, the trial court also give a jury instruction on "no duty to retreat." The trial court denied this proposal, finding that such an instruction applied only to instances where defendant was in his home or business.

The law on the duty to retreat, as acknowledged by both parties, is set out in *State v. Pearson*, 288 N.C. 34, 215 S.E.2d 598 (1975), where our Supreme Court stated:

> [I]f a person is attacked in his own dwelling, home, place of business, or on his own premises, and is also free from fault in bringing on the difficulty, he is under no duty to retreat, whether the assailant is employing deadly force or nondeadly force. Of course, in order to justify the use of deadly force under these circumstances the person attacked must believe it to be necessary and must have a reasonable ground for such belief. On the other hand, where the person attacked is not in his own dwelling, home, place of business, or on his own premises, then the degree of force he may employ in self-defense is conditioned by the type of force used by his assailant. If the assailant uses nondeadly force, then generally deadly force cannot be used by the person attacked; provided there is no great disparity in strength, size, numbers, etc., between the person attacked and his assailant. However, if the assailant uses deadly force, then the person attacked may stand his ground and kill his attacker if he believes it to be necessary and he has a reasonable ground for such belief.

*Id.* at 43, 215 S.E.2d at 605. A judge must declare and explain the law arising upon the evidence. North Carolina General Statutes § 15A-1232 (1988). In the case *sub judice*, the trial court instructed the jury on first degree murder, second degree murder and voluntary manslaughter; the court also instructed the jury on self-defense. In the instant case, if the evidence shows that O'Hara Sneed used deadly force, defendant was permitted to stand his ground and kill O'Hara Sneed if defendant believed it necessary and had a reasonable ground for such belief.

A review of the evidence shows that O'Hara Sneed was the aggressor in the events preceding the first shooting. The evidence

shows that after the first shooting, O'Hara Sneed made a U-turn in his car and pursued defendant. Defendant testified that he was speeding and could see O'Hara Sneed coming up behind him. Defendant testified that he came to a red light where two cars were stopped and traffic was going both ways on the intersecting street, and defendant testified that he could still see O'Hara Sneed coming up in his rear view mirror, and so he turned around. Defendant testified that as he turned around, O'Hara Sneed was outside of his car pointing a gun at defendant, and defendant stuck his gun out of his car window and shot. Defendant stated that O'Hara Sneed then jumped in his car and came forward while defendant backed up, and that O'Hara Sneed then got out of his car and his car started rolling back. Defendant testified that when the car started rolling back O'Hara Sneed put one foot in the car and pointed the gun at defendant again and that defendant started shooting again. Based on this evidence, we find that the evidence shows that because O'Hara Sneed was using deadly force, defendant was permitted to stand his ground and kill O'Hara Sneed if defendant believed it necessary and had a reasonable ground for such belief. We find that the trial court erred in failing to instruct that defendant had no duty to retreat and we therefore award defendant a new trial.

Defendant also argues on appeal that the evidence was insufficient to persuade a rational trier of fact of each essential element beyond a reasonable doubt of the crime of voluntary manslaughter. Defendant argues that "there was insufficient evidence to sustain a finding that either the defendant used excessive force or was the aggressor, the only bases for a finding of voluntary manslaughter." After a review of all the evidence, we reject this argument.

[2]  Defendant next argues that the trial court erred in admitting a statement made by O'Hara Sneed because the statement was hearsay, irrelevant, incompetent and unfairly prejudicial to defendant. Joe Sneed, while testifying as to the events leading up to the shootings, stated that O'Hara Sneed asked defendant why he had recently pulled a gun on him and threatened him. After a *voir dire*, the trial court permitted this statement as a hearsay exception, pursuant to North Carolina General Statutes § 8C-1, Rule 803 (1),(2) or (3) (1992).

We find that the statement was properly admitted pursuant to Rule 803(3), which deals with a statement of the declarant's then existing state of mind, emotion, sensation or physical condition. "Evidence of the [alleged] threats made by defendant was admissible to

explain [O'Hara Sneed's] then-existing mental and emotional state[.]" *State v. Lynch*, 327 N.C. 210, 224, 393 S.E.2d 811, 819 (1990).

We next address defendant's argument that the trial court plainly erred in instructing on reasonable doubt because the instructions lessened the State's burden of proof, deprived defendant of due process, and otherwise were contrary to state and federal constitutional law. We reject this argument. *See State v. Patterson*, 335 N.C. 437, 439 S.E.2d 578 (1994).

[3] Defendant next argues the trial court committed plain error in instructing on flight because the instruction was not supported by the evidence, was an impermissible expression by the court, and lessened the State's burden of proving each essential element beyond a reasonable doubt. We disagree. The evidence shows that after the shootings, defendant, who testified that he saw Debra Henry's body fall out of O'Hara Sneed's car and that he believed he had shot O'Hara Sneed, jumped into his car and left and thereafter picked up his friend and disposed of his gun before he called Officer Yost. We find the trial court properly instructed the jury on flight.

Defendant's remaining argument is based on an assignment of error not in the record on appeal and is therefore dismissed.

New trial.

Judges MARTIN and THOMPSON concur.