MURPHY, Judge.
 

 *372
 
 Breyon Bradford ("Defendant") appeals from his convictions for (1) two counts of assault with a deadly weapon with intent to kill inflicting serious injury; (2) two counts of discharging a firearm into occupied property; and (3) assault with a deadly weapon with intent to kill. On appeal, he contends that the trial court erred by providing an instruction to the jury on flight. Specifically, he asserts that because he was a passenger-not the driver-of the vehicle that fled the scene while he shot at a crowded car, the State failed to present sufficient evidence at trial to merit such an instruction.
 

 Defendant also contends that several clerical errors were made by the trial court necessitating remand. Specifically, he asserts that the incorrect file numbers were recorded on the verdict sheets, final judgment forms, and appellate entries. After careful review, we conclude that Defendant received a fair trial free from error, however, we remand for the limited purpose of correcting the clerical errors present on the face of the final judgment forms and related documents.
 

 Factual Background
 

 At approximately 5:00 p.m. on 14 July 2015, Najee Cunningham ("Najee") and his brother, James Cunningham ("James"), drove in Najee's silver Buick to the Exxon station at the intersection of New Bern Avenue and Trawick Road in Raleigh, North Carolina after picking up Najee's one year old son, N.D.,
 
 [1]
 
 from daycare. After pulling into the station and parking at one of the gas pumps, Najee went inside to buy gas leaving N.D. in the backseat of the car. While Najee was paying, James began fueling the Buick.
 

 As James was pumping gas, he noticed a burgundy Volkswagen Passat parked in front of Najee's car at another pump. The front passenger-side window of the Passat was open and James saw Defendant staring out of it at him with a "crazy look." James asked Defendant, "[w]hat the F were you looking at?" Defendant responded by pointing a black handgun out of the car window at James.
 

 Shortly thereafter, Najee returned to his car. James told Najee that Defendant had pointed a gun at him, and Najee proceeded to get out of the Buick and yell at Defendant and the driver of the Passat, William Holden ("Holden"), that his son was in the backseat of the car. He then returned to the Buick at which point both James and Holden began driving their respective vehicles toward the station exit.
 

 *373
 
 As they reached the station exit, Holden's Passat was positioned directly in front of Najee's Buick. Suddenly, the Passat accelerated causing its tires to "squall" as it pulled out of the gas station and onto New Bern Avenue. As the Passat was turning, Defendant leaned out of the open passenger-side window, and fired his gun multiple times back towards the Buick and the station. One of the bullets went through Najee's front passenger door, hitting Najee-who was seated in the front passenger seat just feet from one year old N.D.-in his buttocks. Another bullet went through the wall of the
 
 *548
 
 nearby Microtel Inn and Suites hotel hitting Wylie Mendicino ("Mendicino")-who was staying at the hotel and laying in bed at the time with his girlfriend Logan Ardrey-in his right thigh. The Passat continued down New Bern Avenue at a high rate of speed. Both Mendicino and Najee were taken to WakeMed and treated for their gunshot wounds shortly thereafter.
 

 After speeding away from the Exxon station, Defendant told Holden to stop the Passat at Rodgers Lane. He then abandoned Holden and the vehicle and left the area on foot. Shortly thereafter, he disposed of his handgun in an unknown location.
 

 After examining surveillance video footage from the Exxon station, detectives with the Raleigh Police Department determined Holden's identity based on the Passats' license plate number. Detectives contacted Holden's father who was the registered owner of the Passat. Holden's mother then called Holden, who came to his parent's house where he was interviewed about the shooting. During the interview, Holden identified Defendant as the shooter. Defendant was subsequently located and arrested.
 

 On 17 August 2015, Defendant was indicted on charges of (1) assaulting Najee with a deadly weapon with intent to kill inflicting serious injury; (2) conspiracy to commit assault with a deadly weapon with intent to kill inflicting serious injury
 
 [2]
 
 ; (3) assaulting N.D. with a deadly weapon with intent to kill; (4) assaulting James with a deadly weapon with intent to kill; (5) two counts of discharging a firearm into occupied property; and (6) assaulting Wylie Mendicino with a deadly weapon with intent to kill inflicting serious injury. A jury trial was held in Wake County Superior Court beginning on 7 March 2016 before the Honorable Kendra D. Hill.
 

 At trial, the State proffered the testimony of James, who stated that neither he nor Najee were armed with a gun during the gas station
 
 *374
 
 incident. He further testified that he did not provoke Defendant into shooting at them in any way. The State additionally introduced the testimony of Najee who also stated that he and James were unarmed that day.
 

 In addition, the State introduced the testimony of the driver, Holden, who stated the following during direct examination:
 

 Q. Did you at any point see the [D]efendant shooting or hear him shooting from your vehicle back towards the gas station?
 

 A. As I started to leave.
 

 Q. Okay. So how soon after you get onto New Bern Avenue do you hear or see gunfire?
 

 A. Maybe five seconds. I'm not sure. About five seconds.
 

 Q. Could you tell where the gray Buick was when the shots were fired?
 

 A. In my mirror.
 

 Q. In your mirror? In your mirror back at the exit or actually out on New Bern Avenue?
 

 A. Out on New Bern.
 

 Q. Out on New Bern. Okay. About how much distance between the two of you? Between the two cars, I should say.
 

 A. I'm not exactly sure.
 

 Q. Do you recall hearing or seeing any gunfire come from that car, from the gray Buick?
 

 A. Couldn't really hear or see. I was focusing on driving, so I'm not sure.
 

 Q. So what happened after shots were fired?
 

 A. I proceeded up New Bern.
 

 Q. Okay. Who fired shots?
 

 A. Breyon.
 

 Q. The [D]efendant?
 

 A. Correct.
 

 *375
 
 Q. Okay. Do you know what kind of gun he fired?
 

 A. A handgun, I suppose.
 

 Q. Do you know the size or caliber?
 

 A. I didn't.
 

 ....
 

 Q. Okay. Was the [D]efendant with you that whole time?
 

 *549
 
 A. No.
 

 Q. Okay. Did he get out of the vehicle?
 

 A. Up towards Roger Lane.
 

 Q. Okay. Did he ask you to stop or did you stop and tell him to get out? What did you do?
 

 A. I stopped.
 

 Q. Okay. Why?
 

 A. Because I was upset.
 

 Q. About what?
 

 A. About what just happened.
 

 Q. Can you tell the jury why? What was upsetting to you about it?
 

 A. I was upset because I figured that the police department will contact my father because I was on camera at the gas station pumping gas with his credit card, and the incident happened where I figured they would describe my car and they'll run the cameras back and it would lead back to me.
 

 Q. Did it lead back to you?
 

 A. Yeah.
 

 ....
 

 Q. Okay. Now, after-when you were upset and the [D]efendant got out of your car at Rogers Lane, what did you say to him?
 

 A. Exactly what I just said to the jury, that I figured that they would try to come at me about the situation.
 

 *376
 
 Q. Did he respond?
 

 A. Yup.
 

 Q. What did he say?
 

 A. Told me not to worry about it, that he was going to take his charge.
 

 Defendant testified on his own behalf at trial. His theory of the case was that he had acted in self-defense. He claimed that Najee had pointed a gun at him as Holden was pulling out of the Exxon station onto New Bern Avenue, prompting him to fire his own weapon in response.
 

 On cross-examination, Defendant admitted that he had disposed of the gun he had shot while at the Exxon station and was unaware of its current location.
 

 Q. Where is that gun, by the way?
 

 A. I don't know. I couldn't tell you.
 

 ....
 

 Q. Did you dispose of the gun after this all happened?
 

 A. Yes, sir.
 

 During the charge conference, the State requested an instruction on flight and Defendant's trial counsel objected. The trial court then proceeded to provide the jury with the following instruction on flight:
 

 The State contends, and the defendant denies, that the [D]efendant fled. Evidence of flight may be considered by you together with all other facts and circumstances in this case in determining whether the combined circumstances amount to an admission or show a consciousness of guilt. However, proof of this circumstance is not sufficient, in itself, to establish [D]efendant's guilt.
 

 The jury acquitted Defendant of the charge of assault with a deadly weapon with intent to kill N.D., and found Defendant guilty of all remaining charges. The trial court consolidated Defendant's assault with a deadly weapon with intent to kill inflicting serious injury convictions and sentenced Defendant to 44-65 months imprisonment. The trial court also consolidated the discharging a firearm into occupied property convictions and sentenced Defendant to 38-58 months imprisonment, to begin at the expiration of his sentence for his assault with a deadly weapon with intent to kill inflicting serious injury convictions. Finally,
 
 *377
 
 the trial court sentenced Defendant to 20-36 months imprisonment for his assault with a deadly weapon with intent to kill conviction, suspended that sentence, and placed Defendant on 36 months supervised probation to begin upon his release from prison for his other convictions. Defendant gave oral notice of appeal in open court.
 

 Analysis
 

 I.
 
 Jury Instruction on Flight
 

 Defendant argues that the trial court erred in instructing the jury on the theory of flight. Specifically, Defendant contends that because he was the passenger in the car that sped away from the gas station-and not the driver of the vehicle-that the State failed to carry its burden in presenting sufficient evidence
 
 *550
 
 to support a flight instruction. We disagree.
 

 "This Court reviews jury instructions only for abuse of discretion. Abuse of discretion means manifestly unsupported by reason or so arbitrary that it could not have been the result of a reasoned decision.... The party asserting error also bears the burden of showing that the jury was misled or that the verdict was affected by the instruction."
 
 State v. Allen
 
 ,
 
 193 N.C.App. 375
 
 , 381,
 
 667 S.E.2d 295
 
 , 300 (2008) (internal citations and quotation marks omitted).
 

 It is well settled that:
 

 Evidence of a defendant's flight following the commission of a crime may properly be considered by a jury as evidence of guilt or consciousness of guilt. A trial court may properly instruct on flight where there is some evidence in the record reasonably supporting the theory that the defendant fled after the commission of the crime charged. However, mere evidence that defendant left the scene of the crime is not enough to support an instruction on flight. There must also be some evidence that defendant took steps to avoid apprehension.
 

 State v. Lloyd
 
 ,
 
 354 N.C. 76
 
 , 119,
 
 552 S.E.2d 596
 
 , 625-26 (2001) (internal citations, quotation marks, brackets, and alteration omitted).
 

 The bar for a defendant taking "steps to avoid apprehension" such that an instruction on flight will be deemed proper is low. Indeed, "this Court [has] noted that an action that [is] not part of defendant's normal pattern of behavior could be viewed as a step to avoid apprehension."
 
 Allen
 
 ,
 
 193 N.C.App. at 382
 
 ,
 
 667 S.E.2d at 300
 
 (citation, quotation marks, brackets, and ellipses omitted).
 

 *378
 
 Here, it is undisputed that Defendant (1) fired his gun while the Passat was already in the process of speeding away from the Exxon station after turning onto New Bern Avenue at a high rate of speed such that the tires "squalled"; (2) told Holden to stop at Rogers Lane after the Passat had sped away from the scene, abandoned his transportation, and then proceeded to leave the area on foot; and (3) intentionally disposed of his gun shortly thereafter. All of the above evidence plainly supports an instruction on flight in spite of the fact that Defendant was not actually driving the Passat when it fled the Exxon station.
 
 See
 

 State v. Nixon
 
 ,
 
 117 N.C.App. 141
 
 , 152,
 
 450 S.E.2d 562
 
 , 568 (1994) (holding flight instruction proper where after shooting multiple victims, defendant left scene and disposed of gun).
 

 As a result, we are satisfied that the trial court did not err by instructing the jury on the theory of flight. Defendant's arguments to the contrary are without merit.
 

 II.
 
 Clerical Errors
 

 Defendant also asserts that the trial court made several clerical errors. Specifically, he claims that the trial court recorded the incorrect file numbers on several trial court documents including the final judgment forms. We agree.
 

 We have consistently maintained that "[w]hen, on appeal, a clerical error is discovered in the trial court's judgment or order, it is appropriate to remand the case to the trial court for correction because of the importance that the record speak the truth."
 
 State v. Smith
 
 ,
 
 188 N.C.App. 842
 
 , 845,
 
 656 S.E.2d 695
 
 , 696-97 (2008) (citation and quotation marks omitted).
 

 A clerical error is defined as an error resulting from a minor mistake or inadvertence, especially in writing or copying something on the record, and not from judicial reasoning or determination.... This Court has held that an error on a judgment form which does not affect the sentence imposed is a clerical error, warranting remand for correction but not requiring resentencing.
 

 State v. Gillespie
 
 ,
 
 240 N.C.App. 238
 
 , 245,
 
 771 S.E.2d 785
 
 , 790 (citation, quotation marks, and brackets omitted),
 
 disc. review denied
 
 ,
 
 368 N.C. 353
 
 ,
 
 777 S.E.2d 62
 
 (2015).
 

 Here, it is undisputed that the trial court erroneously recorded the incorrect file numbers on the verdict sheets, the final judgment forms,
 
 *379
 
 and appellate entries. Consequently, we remand to the trial court for the limited purpose of correcting these clerical errors.
 
 *551
 

 Conclusion
 

 For the reasons stated above, we conclude that Defendant received a fair trial free from error. However, we remand to the trial court for the limited purpose of correcting the aforementioned clerical errors.
 

 NO ERROR; REMANDED FOR CORRECTION OF CLERICAL ERRORS.
 

 Judges STROUD and DILLON concur.
 

 [1]
 

 Initials are used throughout this opinion to protect the identity of the minor child.
 

 [2]
 

 Prior to trial, the State elected not to proceed on the conspiracy charge and it was accordingly dismissed.